HENRY LIVESEY, PLAINTIFF IN ERROR, V. THE OMAHA HOTEL COMPANY, DEFENDANT IN ERROR.

1. **Pleading:** CONTRACT: AVERMENTS OF PETITION. In an action upon a contract containing a condition precedent, the plaintiff must aver performance to show a cause of action against the defendant.

2. ———: ———: ———. To maintain an action upon such contract without performance, the plaintiff must aver all the facts necessary to ·show a waiver of the condition precedent and fix the defendant's liability without such performance.

3. **Corporation:** SUBSCRIPTION TO STOCK: CONDITION PRECEDENT. When the subscription contract or charter of a corporation specifically fixes the capital stock at a certain amount, divided into shares of a certain amount each, the capital so fixed must be fully subscribed before an action will lie against a subscriber to recover assessments levied on the shares of stock, unless there is a clear provision in the contract to proceed with the accomplishment of the main design, with a less subscription than the whole amount of capital specified, or there is a waiver of the condition precedent.

4. ———: ———: ———: WAIVER is an intentional relinquishment of a known right, and there must be both knowledge of the existence of the right and an intention to relinquish it.

5. ———: CONSTRUCTION OF GENERAL INCORPORATION LAW. Sections 124 and 137 of the general incorporation act, were intended only to define and grant the general powers which may be exercised by a corporation when legally organized.

6. ———: ———. Sections 126 and 132 of the same act were not intended to nullify the settled rule of law in regard to the qualifications of a corporation, to enable it to commence business, and therefore do not dispense with a subscription of all the capital stock, when the charter makes such subscription a condition precedent to be performed before proceeding with the accomplishment of the main design.

ERROR to the district court for Douglas county. The opinion states the case

*Experience Estabrook, E. Wakeley, and G. W. Ambrose,* for plaintiff in error, submitted as a part of their argument, an opinion prepared by Hon. Isaac F. Redfield in support of their position that the court below erred in its instructions to the jury, and in rendering judgment against the plaintiff in error for the amount of unpaid assessment levied on the shares of stock, subscribed by the plaintiff in error to the capital stock of the Omaha Hotel Company.

The opinion of Judge Redfield is as follows:

### CUMULATIVE REMEDIES.

I.   The question how far the mere subscription for shares in a joint stock corporation will bind the subscriber to pay assessments to the full amount of the shares where the subscription contains no promise of that kind, may possibly be regarded as an open question by some.   We know there are some decisions denying that such subscription imposes any obligation to pay assessments—and these cases have held that where such a subscription contains a provision enabling the corporation to take a forfeiture of the shares for non-payment of assessments, this is the only remedy open to the corporation.   But after long and full examination of both these questions, as well upon principle and reason as upon authority, I have been unable to come to any other conclusion than that the subscription for shares imports an undertaking to pay the amount of such shares in such assessments as the corporation shall make in conformity with the charter and the terms of subscription, and that the provision for forfeiture is merely cumulative as a remedy, and leaves the obligation to pay assessments good against the subscriber for any balance which may remain unpaid.   The question is fully discussed and the authorities cited at length in 1 Redfield on Railways, 175, *et seq.*, 549 pl. 2, n. 2, 3, 4.

I can add nothing to what is there said, and it might not become me to contradict it unless upon some better grounds than would be possible for me to urge in this case.

### ALL THE CAPITAL TO BE SUBSCRIBED.

II.   The question, too, whether a corporation having a definite capital stock, can go into operation so as to organize and make assessments upon the subscriptions before the full amount of the capital stock is subscribed, there being no special provision, either in the charter or subscription to that effect, seems to be entirely well settled in the negative.   There are many cases where such corporations have been allowed to go into effect upon special provisions, either in the charter or subscription, or the general laws of the state, but there is no case of authority where this has been maintained upon general principles.   This rule has been held inflexible in all cases, both for the security of the public, and also of the subscribers.

The entire subscription of the capital stock by responsible persons before the corporation is allowed to come into operation, is the only guarantee to the public of the corporate responsibility; and the same condition is equally important to all the preliminary subscribers until the entire subscription is filled, as a security against being compelled to contribute to the beginning of an enterprise until some security is furnished of its ultimate completion.   All the preliminary subscriptions are merely provisional and dependent upon the condition of the stock being all taken.   Until that is secured the subscriptions amount to nothing more than offers to take the number of shares named provided the whole stock is taken.   The whole enterprise remains a mere scheme for the creation of a corporation until the stock is all subscribed.   It then first begins to assume corpor-

ate existence and to do things with binding force. Whatever is done before is merely provisional, to become binding if the stock is all taken, if not, to go for nothing. The subject is fully discussed and the cases cited in 1 Redfield on Railways, 188 *et seq.*, § 51, pl. 3, n. 3. We could add nothing more. The subject also comes under consideration in *New Haven & Derby R. R. Co. v. Chapman*, 12 Am. Law Reg., N. S. 80 and note; and we might cite any number of cases all in the same direction; and we are confident not one can be found in conflict with them. So that we need not further discuss this point.

### CASE AT BAR NO EXCEPTION.

III. The only question of any doubt in this case must be whether it can be brought within any exception to the general rule. This is claimed, as we understand, solely under the provisions of section 132 of the General Statutes, entitled "Corporations," which provides: "Any corporation formed without legislative enactment may commence business as soon as its articles of incorporation are *filed* by the county clerk," etc. This, unquestionably, in a literal sense, has very much the appearance of dispensing with all other qualifications for corporations to commence business, except the mere filing of their articles of incorporation; for " commencing business " naturally imports all business and might, therefore, well embrace assessments upon subscriptions. But the very gross absurdity of supposing that the legislature could seriously have intended to make a mere filing, or recording of its articles of association, the only qualification for corporate action would naturally lead all courts to look carefully, to find out more precisely how this section comes to be in this particular phraseology. There seems to me to be many reasons why we could not, in justice, give this provision the strict and literal construction

which the plaintiffs seem to have adopted in getting up this corporation.

1. The mere recording the articles without any, or with imperfect subscriptions to stock, would be no qualification for the corporation "commencing business," but rather the contrary. When the legislature well knew that, by the general law, corporations of this character must have all their stock subscribed before they could legally begin business, we can scarcely suppose they would, purposely, throw away this public safeguard without securing some other in its place. But what possible security could it afford the public, or anybody else, to have their blank articles of association or incorporation recorded, as was done in this case on the 21st day of January, 1870, before any attempt at organization, or the obtaining of a single valid subscription? For the defendant is not claimed to have paid the first ten per cent on his subscription till the first of February; and till that payment, by the very terms of the subscription, no valid subscription could be made. And there is nothing to show that any of the other subscribers perfected their subscriptions earlier than the defendant. The language of the petition would seem to indicate that they did not—"That the total amount subscribed as aforesaid to said capital was, on said day" [the first of February, 1870] "$125,500." It would seem very obvious from the language of the petition that after those interested had obtained the pledge of $150,000 to the corporation when formed, they met and formed the scheme of a corporation, or, as it is called, "entered into articles of association and incorporation" providing for a capital stock of $200,000. This was on the 19th of January, 1870. It is not stated that any one subscribed the articles, but if they did it would amount to nothing whatever until the first ten per cent was paid. This is entirely well settled as to cases like the present under

similar statutes. *Black River & Utica R. R. Co. v. Clarke*, 25 N. Y., 208. *Beach v. Smith*, 30 N. Y., 116. *N. Y. & Oswego M. R. R. Co. v. Van Horn*, 57 N. Y., 473. On the 21st of January these blank articles were recorded in the county clerk's office, and on the 1st of February, if ever, the ten per cent on subscriptions was paid, and on the 8th of March they "elected a board of directors." How very absurd, then, it is to suppose that any statute could seriously intend to provide such a recording as the full qualification for "commencing business."

2.  But on looking carefully into the statute we shall find that section 132 was never adopted with any design of defining corporate qualification for going into business.  Section 132 is obviously a mere explanation of section 126.  That section (126) is prohibitory upon corporations going into business, *except to organize*, until their "articles of incorporation are recorded in the office of the county clerk."  Section 132 merely amends this by providing that "*filing* its articles of incorporations by the county clerks" shall have the same effect as recording them as to commencing business. But instead of saying just what they meant to do to amend section 126, they spread it out into a new section —that corporations might "commence business" after filing their articles with the clerk, supposing, of course, that every one would understand the meaning to be, that "filing" should have the same effect as "recording," and not dreaming, probably, that any one would regard this "filing" as intended to embrace all the requisite qualifications of corporations for· going into business.

ARTICLES TO BE ADOPTED AFTER ORGANIZATION.

IV.  But most unquestionably, the statute fairly imports that these articles of association .or incorpora-

tion for the purposes of notice to the public, shall be adopted by the corporation, after its organization, as that is specially excepted from the prohibition from going into business in section 126. Indeed, the corporation could not perform the acts required in that section, of adopting the articles and "have them recorded" until after its organization in some form. It would have no organs or agents until that event. And surely we cannot suppose, with any propriety, that this requirement of the statute would be satisfied by anything less than the full subscription of the capital stock. For if anything less will answer there is no stopping place, short of admitting that one subscription will answer, and no one, we think, will seriously claim that, unless the necessities of the plaintiffs' case should drive them to that extremity. For, as before said, it would seem that the articles in this case must have been an entire blank, in legal effect, when recorded. We cannot doubt that the statute contemplated that the corporation should conform to all the requirements of the general law, in obtaining its full subscription before organization, and then adopt the articles of incorporation and have them recorded, or "filed" in the proper office, as notice to the public, that they had conformed to all the requirements of the law. I think, therefore, that, although it is very evident the statute never intended to define the qualifications of corporations before going into business, but to leave them subject to all the requirements of established law, and only require notice to the public of their condition before actually entering upon business, still we cannot doubt that these articles of association at the time of filing for record, were to be complete, and show the possession of a capital stock, upon which the corporation could make assessments, which they could not do till all the shares were taken.

### NO WAIVER.

V. It only remains to inquire whether the defendant is estopped from insisting upon these defenses. There is nothing claimed by way of acquiescence on the part of defendant, except his participation in the organization and his payment of the first ten per cent upon his subscription. The organization, whatever it was, must have been regarded by all, as merely provisional, to become binding if the stock was all subscribed; otherwise to go for nothing. This could not, in any sense, be fairly construed as an acquiescence in the corporation going into operation before its capital stock was secured. It was of course merely a provisional arrangement to secure the money accruing from the first installment and such other interests of. the corporation as might require looking after, before full corporate existence was secured. Some such conventional arrangement is always convenient, and sometimes almost a necessity, and is often resorted to, either within or without the corporation, but is understood by all, as having no binding effect upon the corporation, whenever it comes into a condition to exercise corporate functions, by completing its subscription. Until then there can be no representation of all the corporate stock, when, for the first time, binding corporate action begins. No one is or can be deceived by any such provisional action, and without this element of misleading others there can be no binding estoppel, or effective acquiescence, in any course short of the full requirements of the law, to give effect to corporate existence or action. And the payment of the first ten per cent was indispensable, by the very terms of the association, to make any subscription binding, merely as such. Without this, they could not even begin to take subscriptions. To construe this as committing the party to future assessments until the full subscription was

obtained would be strange indeed.  This view is fully sustained by the decisions.  *S. and K. R. R. Co. v. Cushing*, 45 Me., 524.

#### ACTUAL NOTICE MUST BE GIVEN.

VI.  As to the proper form of making the assessments there can be no question that the general rule, applicable to similar questions, would require notice to the subscribers before any default would occur, or any action could be maintained.    1 Redf. Railw., 159, 160, n 2, 3, 4.    And I should regard the decisions in Illinois and Indiana, *Peake v. Wabash R. R. Co.*, 18 Ill., 88; *Ross v. Lafayette & Indiana R. R. Co.*, 6 Ind., 297; *Fisher v. Evansville & Crawfordsville R. R. Co.*, 7 Id., 407, and the case of *Lake Ontario etc. R. R. Co. v. Mason*, 16 N. Y., 451, so far as it countenances a different course, as resting upon no satisfactory basis, either in authority or principle.

#### CONCLUSION.

1.  I conclude, therefore, that the statute was not intended to dispense with the general rule of law requiring full subscriptions of the capital stock before corporate action could begin, and especially before any valid assessments could be made.

2.  That if the statute could be construed as providing a basis for corporate action to begin, there has been no compliance whatever with the requirements of the statute in this case.

3.  That, on both grounds, there could be no valid assessments until the subscription reached $200,000, and so far as appears it has never been carried above $125,000.

4.  That if every other obstacle were removed, there has never been any valid assessment made upon the defendant's shares, for want of notice.    It seems to me,

therefore, that the plaintiffs cannot recover without such a departure from all established rules of law as I am convinced the court will never countenance.

ISAAC F. REDFIELD.

*Boston, November* 15, 1875.

· *J. M. Woolworth*, for defendant in error, argued this as well as the other cases against the Hotel Company upon briefs from which the following points are taken:

I.　We do not dispute the principle of law upon which the plaintiffs in error seek to avoid their liability here, as laid down in the leading case of the *Salem Mill-dam Corporation v. Ropes*, 6 Pick., 23, and the many cases following it; namely, that where, by an act of incorporation, the number and par value of the shares in the corporation are fixed so as to require a certain capital, an assessment on the stock of a subscriber cannot legally be levied until the whole number of shares are subscribed.　But we insist that the principle has no application here, and in the first place, because these plaintiffs in error have waived the protection of that principle.

The case of Balcombe stands thus: The second assessment was made May 24, 1870, payable June 10, and this he paid.　At the meeting of January 19, he was reported as one of the many other subscribers of ten shares to the stock.　In the proceedings of the meeting of the stockholders, on the 8th of April, he was present and took part, voting in the negative upon the very important question of turning over to Mr. Redick the entire enterprise with all the property, subscriptions, stock, etc.　And at the meeting of the directors on the 18th of April, when the same and other important matters were under consideration, he was present and spoke quite earnestly of every one of those matters.

Frost's case stands thus:  At the meeting of January 19, he was reported as a subscriber.  At a meeting in February, Alvin Saunders held and voted upon his proxy, upon the very important question of the location of the hotel, as he did also at the meeting of April 8.  On the 18th of April, he, as one of the stockholders, signed a paper giving consent to the diversion of two thousand dollars of the corporate funds to make up the deficiency of the subscription of the donors for the site of the hotel.

Livesey was also reported a subscriber at the meeting of January, voting as proxy for Isaac Clegg, and with Frost and others, signed the consent to the diversion of the two thousand dollars for the purchase of the site.

Sweesey was a subscriber to the fund for the purchase of the site.  Boehme paid three assessments, made respectively on the 24th of May, payable on the 15th of August, 25th of July, payable on the same day, and 29th of August, payable on the 15th of September.  He was present at the meeting of April 8, and with Balcombe and others, voted upon the proposition to dispose of the entire property, and on the 18th of that month, with Frost and others, in his capacity as a stockholder, signed a paper consenting to the diversion of two thousand dollars of the funds of the corporation, to answer the deficiency in the donors' subscription.

It is to be noted that the records show no meeting of stockholders after those at which these parties appear to have been present; so that the circumstance, that no further evidence of their participation in the affairs of the company is not produced, cannot be taken as indicating that they ever withdrew from the enterprise. And, besides, it was incumbent upon them after having gone along with their associates for a considerable time, to show that they withdrew from the company, if such were the fact; and no such proof having been offered,

we are entitled to assume that they did not withdraw, or notify the company of their intention so to do.

During the period in which these parties are thus shown to have participated in the proceedings of the corporation, as stockholders, the company entered upon, and prosecuted to a very considerable extent, its enterprise of building a hotel, and levied the assessments sued for. This course of conduct, on their part, was a waiver of all claim, which they otherwise might make, that they should not be held upon their subscription until the whole capital was taken. That such conduct displaces the principle of law, invoked by the plaintiffs in error, is shown by several of the best considered cases. *Cabot and West Springfield Bridge v. Chapin*, 6 Cush., 53. *N. H. Central Railroad v. Johnson*, 30 New Hamp., 390. *Trustees of Farmington Academy v. Allen*, 14 Mass., 172. *Kansas City Hotel v. Harris*, 51 Mo., 464. *Railroad v. Lacey*, 3 Y. & J., 80. *Pitchford v. Davis*, 5 M. & W., 2.

II. The doctrine of the Salem Mill-dam case, is inapplicable here, for another and independent reason, viz: that the charter of this company expressly authorizes it to commence business before its whole capital stock is subscribed.

1. The charter of this company is the general incorporation law and its articles of association taken together, and the liability of the subscribers for their stock is to be determined by their provisions. *Salem Mill-dam Co., v. Ropes, supra. Van Etten v. Eaton,* 19 Mich., 187. *Mann v. Cooke,* 20 Conn., 185. *Hughes v. Antietam Manuf. Co.,* 34 Md., 316.

2. Reading the general incorporation act, and the articles of incorporation together, we find the contract of subscription to be as follows, viz: The whole capital of the company shall be two hundred thousand dollars,

divided into shares of one hundred dollars, payable ten
per cent at the time of the subscription, and the balance
at such times as the directors shall require. (Articles
of incorporation.)

But the amount may be changed. The company may
effect its organization, before the record in the clerk's
office of its articles, and as soon as that is effected, it
may commence its business. It shall have power to sue
and be sued, and hold and convey real and personal prop-
erty, and render the interests of stockholders transferrable.
(General incorporation law.) Taking these provisions
together, it is very evident that the legislature intended
to confer upon the corporation the power to enter upon
the main and ultimate object of its organization, not at
such indefinite and possibly remote time as when all its
capital shall be subscribed, but before that is accom-
plished, and as soon as its articles are recorded. *New
Haven, etc., R. R. v. Chapman*, 38 Conn., 56. *Hamil-
ton, etc., Plank Road v. Rice*, 7 Barb., 157. *Schenec-
tady & Saratoga Plank Road Co. v. Thatcher*, 11 New
York, 102. *Lake Ontario, etc., R. R. Co. v. Mason*, 16
New York, 451.


GANTT, J.

The defendant in error claims to be a corporation in-
corporated under the general incorporation laws of the
state, and brought this action to recover assessments
levied on shares of stock subscribed by plaintiff in error
to the capital stock of the company. It is alleged that
the plaintiff in error subscribed for and agreed to take
ten shares of the capital stock of the company. A
meeting was held on the 19th day of January, 1870,
when articles of association and incorporation were
adopted, which provide that the amount of the capital
stock of the company shall be two hundred thousand

dollars, divided into shares of one hundred dollars each, and that an installment of ten per cent shall be paid on each share, at the time of making the subscription, and the residue thereof in such installments, at such times and places, as may be required by the directors. As shown by the evidence, an aggregate of one hundred and twenty-six thousand dollars of capital stock was subscribed, leaving a deficiency of seventy-four thousand dollars of the capital required by the charter. About the last of February, 1870, the parties voted on a location for the hotel, and elected directors, who held their first meeting on the eighth day of March, 1870, and then elected the officers of the company. The articles being filed in the office of the county clerk on the 21st day of January, 1870, the company now became organized, and notwithstanding it appears by the petition as well as by the evidence that the capital required by the charter had not been fully subscribed, yet the corporation was put into a condition to transact some business, if it were not legally authorized to proceed with the accomplishment of its main design. It seems that when the articles are agreed on and adopted and properly filed as is required by the law, the parties to the undertaking, unless prohibited by the charter or positive law, may employ agents to secure the full amount of capital required, to procure information in regard to the enterprise, and may contribute money to pay the expenses incurred in all the necessary preliminary steps in perfecting the organization of the company, without first having secured a full subscription of the capital required by the subscription contract or the charter; but all such and similar acts will afford no satisfactory proof that they intended to proceed with the main design of the corporation, until all the capital stock required shall have been fully secured by subscription to the stock. *Oldtown & Lincoln R. R. Co. v. Veazie,* 39 Maine, 571.

But the first inquiry suggested by the record is—does the petition state all the facts necessary to show a cause of action against the plaintiff in error? The defendant in error sets forth in its petition as matter of fact that the persons subscribing to the stock, on the 19th day of January, 1870, "assembled together and entered into articles of association and incorporation, and thereby agreed" among others that the capital stock should be two hundred thousand dollars, and "that the total amount subscribed to said capital stock was one hundred and twenty-five thousand and five hundred dollars, exclusive of the grounds donated," which it is alleged were of the value of fifty thousand dollars and composed a part of the capital stock. Now if the value of the ground donated to the company be considered as part of the capital, still as shown by the petition there is a large deficiency in the capital required, and therefore there is a non-compliance of the condition precedent, contained in the charter. No reason is given for the non-performance of the condition precedent, and no fact is averred to fix the liability of the plaintiff in error to pay assessments, without performance on the part of the defendant in error. Can the action be maintained on such a showing? In the case of *Fry's Ex'r v. The Lexington & Big Sandy R. R. Co.*, 2 Met. (Ky.), 323–4, it is said that "where a given amount of stock is required to be subscribed before the corporation is authorized to go into operation, this requisition must be regarded as an indispensable condition precedent. Each subscriber undertakes to pay the amount of his subscription only in the event, and upon the condition, that the whole amount of the capital stock, required by the charter to enable the company to organize and commence operation in its corporate capacity, shall be subscribed." In reference to the pleading in such case, it is said that "it is a well settled rule of pleading that the plaintiff must aver per-

formance of all the conditions precedent in the contract, when the liability of the defendant is dependent on their performance.    In this case the liability of the defendant depends upon the fact whether a subscription of one hundred thousand dollars had been obtained, when his intestate was called on to make payment on his stock. Unless a subscription to that amount had been obtained, he was not, according to the implied terms upon which he became a stockholder, liable upon his subscription. As the petition must state all the facts necessary to show a cause of action against the defendant, and as the fact that stock to the amount of one hundred thousand dollars had been subscribed, is one that is *indispensable* for that purpose, the failure to aver it renders the plaintiff's petition fatally defective." The case at bar, in respect to the condition precedent, is similar to the one above cited, and involves the same principle.    Therefore if the defendant in error cannot aver performance of this condition precedent, and if the action can be maintained without such averment, must not the petition contain all the necessary averments which will take the case out of the rule of pleading above stated?    Must not facts be averred which will show a liability without all the capital required by the charter being first subscribed?    It seems to me as the pleading now stands, it is difficult to escape the conclusion that the petition is fatally defective in this regard.

But assuming that the averments in the petition are sufficient to constitute a cause of action against the plaintiff in error, I will now consider the main grounds of defense to the action urged by the plaintiff in error, and in doing so it will be necessary to recur to some facts as shown by the record.    The subscription paper fixed the cost of the hotel at not less than one hundred and fifty thousand dollars, and the articles of incorporation provide that "the capital stock of said company shall be

*two hundred thousand dollars*, divided into shares of one hundred dollars each." But it is stated as matter of fact in the third paragraph of the petition "that the total amount subscribed to said capital stock was $125,-500," and it is alleged that the ground on which to erect the hotel was donated to the company, and that the same is of the value of fifty thousand dollars and became a part of the capital of the company. Suppose this value of the ground should be added to the amount raised by subscription to the stock, it would still leave a deficiency in the capital required of twenty-four thousand and five hundred dollars, as shown by the petition; and if the right to proceed with the main design of the company is based on the subscription contract, it certainly excludes the ground from the capital and still leaves a deficiency of the same amount. But, however this may be, it is clear by the defendant's own showing that the assessments were made without having first secured all the capital required by the subscription contract or the charter of the corporation. Can the action be maintained for the recovery of the assessments on the shares of the capital stock before the amount of capital required is fully subscribed? When the amount of stock is subscribed and the company is authorized to proceed in the execution of its main design, it becomes a body corporate, a distinct and independent existence from all its members, and being thus in law a distinct party competent to contract, the rules of law in relation to contracts apply to the contract of these parties, and, hence, the rights of each subscriber to the contract are as fully protected by law from the corporate action as if he were a stranger. The corporation has no power to invade or impair the rights of individuals.

And now, in answer to the above question, it need only be stated that the rule seems to be well established that when the charter or subscription contract specifically

fixes the capital stock at a certain amount, divided into shares of a certain amount each, the whole amount of capital so fixed and required for the accomplishment of the main design of the company must be fully secured by a *bona fide* subscription before an action will lie upon the personal contract of subscribers to stock to recover an assessment levied on the shares of stock, unless there is some clear provision in the contract to proceed in the execution of the main design with a less subscription than the whole amount of capital specified. This rule seems to be founded on the principle that by the terms of the grant to the corporation, it is essential to the power of assessment for the general objects and purposes of the institution that the whole capital stock required by the condition precedent must be represented and acted upon by the assessment. This doctrine has underwent an exhaustive discussion in many cases, and it is not deemed necessary to bring into review the arguments in support of it. *Salem Mill-dam Co. v. Ropes,* 6 Pick., 23. *Id.,* 9 Pick., 195. *Cabot & West Springfield Bridge v. Chapin,* 6 Cush., 53. *Schurz v. The S. & T. R. R.,* 9 Mich., 269. *Topeka Bridge v. Cummings,* 3 Kan., 76. *Somerset Railroad Company v. Clarke,* 61 Me., 384. *N. H. Central Railroad v. Johnson,* 30 N. H., 404. *Peoria & Rock Island R. R. v. Preston,* 35 Iowa, 118. And the rule is the same in England. *Fox v. Clifford,* 6 Bing., 776. *Pitchford v. Davis,* 5 M. & W., 2. 4 Moody & M., 151.

The case under consideration comes within the rule above stated, and the action cannot be maintained, or the judgment of the court below be sustained, unless some fact or circumstance is shown which takes it out of the general rule.

It is however contended on the part of the defendant in error that the plaintiff in error has waived his rights under the contract, and by his own acts has become

estopped from denying his liability to pay the assess-
ments.    What are the facts in this regard ?    The record
shows that it contains all the testimony introduced or
offered to be introduced, by either plaintiff or defendant,
on the trial of the cause; and upon a careful examina-
tion of this record, I find that the plaintiff in error par-
ticipated in the transactions of the company as follows:
He subscribed for ten shares of stock and at the same
time paid ten per cent of the amount, to-wit: one hun-
dred dollars, which the articles of incorporation required
to be paid at the time of making the subscription, and
without this payment the subscription would not be com-
plete; again, his proxy was voted at a meeting of the stock-
holders on the .... day of February, 1870, and his name
is signed to a written assent that the company may pay
a deficiency in the collection of donors' subscriptions to
purchase a site for the proposed hotel.    This paper was
presented to the directors, April 18, 1870.    These acts
might have occurred in the preliminary steps taken by
the company, and up to this time the record shows only
such preliminary action as relates to the adoption of the
articles of incorporation, the procuring a site for the pro-
posed hotel, the investigation of the title to the property,
donations by individuals, and a proposition whether the
company should enter upon the execution of the main
design, or whether it should be passed over into the
hands of a private individual.    All this might have taken
place as preliminary measures without intention on the
part of any subscriber to the stock to proceed with the
accomplishment of the main design, until all the capital
stock required by the charter should first be secured by
subscription.

It is not claimed that the plaintiff in error gave any
actual assent to enter upon the main object and purpose
of the company, without first securing a subscription of
the amount of capital required; and surely a constructive

consent, urged from the common law principle that all the corporators are presumed to assent to what is done at regular meetings of the corporation, will not be admitted to deprive one of his rights, for the presumption is that corporations will do none but legal acts; and, hence, the doctrine of presumptive assent to corporate acts applies only to acts which are legally done in the exercise of the powers conferred by the grant; the charter creates the artificial being, invests it with its powers, is its fundamental law and prescribes its mode of operation.

Now, the corporation with full knowledge of the condition precedent, contained in the subscription contract and of that in the charter, and in violation of this condition in the contract, has proceeded to assess the shares of stock, and it is insisted that the plaintiff in error by his acts has waived his immunity from liability to pay such assessments. In other words, the proposition contended for is in effect that these acts of the plaintiff in error are equivalent to an assent by him to the unauthorized proceedings of the corporation, and therefore he is estopped from claiming the rights he had under the contract. It is said that "a waiver is the intentional relinquishment of a known right, and there must be both knowledge of the existence of the right, and an intention to relinquish it." There is a total failure of proof showing that the plaintiff in error acted with knowledge of the fact that a deficiency remained in the capital required by the charter and the facts shown by the record are not sufficient to show an intention to waive the rights of the party. *Pitchford v. Davis*, 5 M. & W., 4. It seems clear that the proposition contended for in this case cannot be maintained either by the facts or the law, and that the authorities do not support it. *The Atlantic Cotton Mills v. Abbott*, 9 Cush., 425. *The Oldtown & Lincoln R. R. v. Veazie*, 39 Me., 571. *Macedon & Bristol Plank Road Co. v. Lapham*, 18 Barb., 313.

Of the cases cited in the argument for defendant in error, that of *Cabot & West Springfield Bridge v. Chapin*, 6 Cush., 51, perhaps approaches the nearest to his purpose. In that case it is said that "if the sub- scriber knowing that the requisite subscription had not been made to fill up the capital, had attended meetings of the corporation and had co-operated in the votes of *expending money* and for *making contracts*, and in other acts which could only be properly done upon the presumption that the subscribers intended to proceed with the stock partially taken up, such subscriber might be estopped from setting up the defense." The principle enunciated in this case will not be questioned although it is an *obiter dictum*, as the decision was wholly upon other grounds, and not upon the question of waiver; and the series of acts mentioned do not apply to the case at bar.

In the case of the *Trustees of Farmington Academy v. Allen*, 14 Mass., 172, the defendant and others, as subscribers, agreed to be accountable for the payment of the respective sums by each one subscribed as a fund to be applied in the establishment of an academy, as necessary to obtain assistance from the legislature; *held*, that an action would lie for money paid, laid out and expended. It was not a subscription to take shares of stock in a corporation with a fixed capital, and, therefore, the case is not analogous to the one at bar.

In *Railway v. Lacey*, 3 Younge & Jervis, 85, the defense was on the ground that a misrecital in an act of parliament rendered the act invalid, and could not be enforced. The defendant concurred in the application to the legislature, he was named as a proprietor, and paid his calls so long as the concern was prosperous; *held*, that by his conduct he held himself forth to the world as a proprietor, and by so doing he took advantage of the

act, and, therefore, could not object to the validity of the statute.

In the case of the *Kansas City Hotel v. Harris*, 51 Mo., 464, the defendant was a stockholder and a director of the company. The action was brought for the fifth and last call, and it is said by the court that " the defendant *having participated* in all the proceedings creating the corporation, and in *increasing the stock* and *making the calls* both as stock holder and director, he is now estopped from raising any question in this action as to their validity." The question of deficiency in the subscription to the stock was not raised in this case. The main defense was that there were two subscriptions, and the petition only counts for one.

Again, it is insisted that by authority of the general incorporation act, the company may "enter upon the main and ultimate object of its organization as soon as its articles are recorded" in the county clerks' office, and that the provisions of the act taken together, show such to be the legislative intention, without any regard to the amount of shares subscribed. If the statute must receive such a construction, then the corporation might commence operations in the execution of its main design without a single valid subscription to the capital stock, notwithstanding a certain amount of capital, divided into shares of a certain amount, is required by the charter. Now, as all the powers and duties of a corporation result from the statute, it seems very clear that an organization of the institution, even with officers, a capital paid up and articles filed as required by law, would be powerless to do one corporate act without a legislative grant to do so; and therefore, it seems clear that sections 124 and 137 of the general statute, were intended simply to define and grant the general powers which may be exercised when the corporation is legally organized. There is no legislative intent expressed in these sections, giving a

inore extended effect to them, and none can be inferred
by implication from the language used or the general
principles of law. It is said that "statutes are to be
construed in reference to the principles of the common
law; for it is not to be presumed that the legislature
intended to make any invasion upon the common law,
further than the case absolutely required." 1 Kent
Com. 514. Section 138, I think is only declaratory of
the common law rule, for in legal contemplation the cor-
poration as a body politic, is a distinct and independent
existence or party from all its members, and may con-
tract with and sue any of its members, and any member
may contract with and sue the corporation; and, hence,
at common law, the corporation is vested with the right
of action to recover arrears, debts and demands against
any of its members, and any member has the same right
of action to recover any debt, claim or demand, he may
have against the corporation. This doctrine is founded
on the general grant of power to the corporation to sue
and be sued. Therefore, this section leaves the legal
*status* of the company the same as it was at common
law. In view, therefore, of the purpose for which these
sections were enacted, it seems clear that there is noth-
ing in them to justify an inference that they were
intended to confer the right of any corporate action, in
respect to the main enterprise of the company, before
its capital stock is secured by subscription.

But it is more earnestly contended that sections 126
and 132 grant the right of proceeding with the "main
and ultimate object" of the company, regardless of the
fact whether all or any of the capital required by the
charter has been first subscribed. Section 126 provides
that "every corporation, previous to commencement of
any business,    *    *    *.    must adopt articles of
incorporation and have them recorded in the office of
the county clerk of the county, or counties, in which the

business is to be transacted;" and section 132 provides that the corporation "may commence business as soon as its articles of incorporation are filed by the county clerk, as required by this sub-division, and shall be valid, if a copy of its articles be filed in the office of the secretary of state, and the notice required be published within four months from the time of filing such articles in the clerk's office." The latter section modifies the former by what may be considered as an explanatory clause, providing that the corporation "may commence business as soon as the articles of incorporation are filed in the county clerk's office," instead of waiting until they are recorded, and by making the validity of the corporation depend on filing a copy of the articles with the secretary of state, and upon publication of the notice required. These two sections point to the same subject matter, and must be considered together as one. It is true that the words, "may commence business," taken in a literal sense by themselves, would seem to indicate a departure from the general rule of law in regard to the necessary qualifications of a corporation to enable it to commence business in its corporate capacity. But in the interpretation of the general incorporation act, it must be borne in mind that the sole object of the statute was to provide a system for the incorporation of companies, without the granting of charters by special legislation, and not to unsettle well established principles of law in regard to the qualifications of corporations to enable them to commence business. The rule is, "*Scire leges non hoc est verba earum tenere, sed vim ac potestatem,* and the reason and intention of the law giver will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction and absurdity." 1 Kent Com., 510. Now, in the organization of a company, to enter upon an enterprise involving large expense and various business transactions, it will hardly be sup-

posed that the legislature intended to make the *mere* filing of the articles of incorporation a sufficient qualification to proceed in the execution of its main design, to enter into contracts for that purpose, to create debts and transact business generally. On the contrary, the legislative intention surely must have been to simply fix the time when the company may commence business, when otherwise qualified; and this interpretation of the law, is supported by the fact that the section does not define any of the qualifications necessary to put the corporation into operation, except the filing of the articles. There is no express provision in the law authorizing it to enter upon the execution of its main object without the performance of a condition precedent contained in its charter; and no such authority is to be inferred from the words "commence business." The members of the company are not prohibited from defining what shall be the qualifications of the corporation to enable it to go into operation, and therefore, when the contract is that a fixed amount of capital, divided into shares of a certain amount each, shall be a necessary qualification, such requisite is a condition precedent, and a fundamental law of the corporation. The general statute and the articles are considered in the nature of a grant from the state and taken together constitute the charter.

Again, at the time the act was passed, it was the settled rule of law that a corporation having a fixed amount of capital, divided into shares of a certain amount each, could not proceed with the execution of its main object, until all its capital was subscribed, unless it was clearly provided that it might do so with a less subscription than the amount of capital fixed by the charter. The presumption is that the legislature had in their minds this common law doctrine then so well established and understood, and that they intended to leave the determina-

tion of all the necessary qualifications to enable the corporation to go into operation, except the filing of the articles, to be provided by the charter, and to be governed by the principles of the common law in force. The conclusion is, that the incorporation act was not intended to nullify the settled rules of law in respect to the qualifications of a corporation, to enable it to commence business, and therefore does not dispense with a subscription of all the capital stock, when the charter makes such subscription a condition precedent to be performed before proceeding with the accomplishment of its main design.

The judgment of the district court must be reversed and the cause remanded with leave to amend the petition if desired so to do.

REVERSED AND REMANDED.