## HELVERING, COMMISSIONER OF INTERNAL REVENUE, v. PRICE.

No. 559. Argued March 5, 6, 1940.—Decided March 25, 1940.

*Mr. Richard H. Demuth,* with whom *Solicitor General Biddle, Assistant Attorney General Clark,* and *Messrs.*

*Sewall Key* and *Berryman Green* were on the brief, for petitioner.

*Mr. George D. Brabson,* with whom *Messrs. David H. Blair, C. R. Wharton, Julius C. Smith,* and *J. G. Körner, Jr.* were on the brief, for respondent.

Mr. Chief Justice Hughes delivered the opinion of the Court.

Respondent in his income tax return for 1932 claimed a deduction for a loss upon a contract of guaranty. The Board of Tax Appeals sustained the Commissioner in refusing to allow the deduction, and the Circuit Court of Appeals reversed. 106 F. 2d 336. Because of an alleged conflict with *Eckert* v. *Burnet,* 283 U. S. 140, *Jenkins* v. *Bitgood,* C. C. A. 2d, 101 F. 2d 17, and *Ferris* v. *Commissioner,* C. C. A. 2d, 102 F. 2d 985, we granted certiorari, 308 U. S. 548.

The facts as found may be thus summarized: In 1929 the Atlantic Bank and Trust Company of Greensboro, North Carolina, was merged with the North Carolina Bank and Trust Company. The latter accepted conditionally certain assets of the Atlantic Bank called "A" assets, and certain other assets, called "B" assets, were pledged to that Bank with authority to charge against them any losses which might be established in realizing upon the "A" assets. Respondent and three other stockholders of the Atlantic Bank executed an agreement of guaranty, to the effect that if the North Carolina Bank failed to realize a certain sum from the "A" assets within two years they would make up the deficiency in an amount not exceeding $500,000. The agreement provided that any sum realized from the "B" assets was to be applied first to any losses occurring in the "A" assets and then to the reimbursement of the four guarantors. The period for realizing upon the "A" assets was extended until September, 1932.

In June, 1931, the North Carolina Bank advised the guarantors that the "B" assets were not in such shape that the Bank could use them to the extent necessary for banking purposes and requested the guarantors to put their guaranty into a bankable form so that it could be used by the Bank to obtain credit. Respondent accordingly gave to the Bank his note for $125,000 and endorsed the note of C. W. Gold, another guarantor, for a like amount and assigned certain securities to the Bank as collateral for the payment of his guaranty. The Bank agreed that respondent's ultimate liability should not exceed $250,000. At the end of 1931, the guaranty agreement was still in effect. The "B" assets were still in the process of collection. No demand had been made upon respondent. While it was known that there would be some loss to the guarantors, it was not definitely known in 1931 what the loss would be, and the guarantors had reason to believe that there would be a substantial reimbursement from the "B" assets of any losses.

In the early part of 1932, financial conditions being worse, the Bank concluded that it would have to collect upon the guaranty and called upon respondent to make a final settlement of his obligations. Accordingly, in March, 1932, respondent made his note to the Bank for $250,000 and received back the two notes. The Board of Tax Appeals found that both respondent and the Bank considered this to be a final payment of the two notes which had been given under the guaranty. The Bank retained the same collateral for the $250,000 note that it had previously held, and in December, 1932, respondent substituted therefor certain securities of his own.

Respondent claimed a loss in 1932 in the amount of $125,000, that is, for his one-half of the guaranty. He did not then claim a loss on the other one-half because he still had a claim against the estate of Gold (who had died in 1932) for reimbursement. For that one-half, representing Gold's part of the guaranty, respondent

claimed a loss in 1933 and that deduction is not here involved.

Respondent kept his accounts upon a cash basis. The Board of Tax Appeals ruled that respondent was not entitled to the deduction of $125,000 in 1932, upon the ground that "he made no outlay of cash" in the purported payment; he had satisfied his liability as guarantor "by a shifting of the form of his liability." His loss would be deductible "in the year in which he pays the note."

Respondent insists initially that the transaction in 1932 was considered by the parties as constituting a payment of respondent's liability under the guaranty, and that this payment is a fact found by the Board of Tax Appeals and is not open to review. But the findings of the Board disclose the entire transaction, and its legal effect in the application of § 23 (e) of the Revenue Act of 1932, as to the deduction of losses sustained during the taxable year, was reviewable by the Circuit Court of Appeals. Its decision on that point is reviewable here.

Both the Commissioner and the Board of Tax Appeals relied upon our decision in *Eckert* v. *Burnet, supra.* In that case, the taxpayer's return was on the cash basis, and the question was as to a claim of deduction for the year 1925. The taxpayer and his partner were joint endorsers of notes issued by a corporation they had formed. In 1925, in settlement of their liability for an ascertained amount, they made a joint note for the amount due to the bank that held the corporation's paper, "received the old notes, marked paid, and destroyed them." We affirmed the ruling that the deduction should not be allowed.

The court below considered that decision as definite authority only for the holding that a loss of the sort set forth was not deductible under the "bad debt" provision of the statute. That indeed was stated in the opinion as

the taxpayer's claim. But the taxpayer had also presented here as an alternative ground the theory of a loss sustained during the taxable year, a ground which the Board of Tax Appeals had considered and held to be untenable. 17 B. T. A. 263, 265, 266. And the Government argued both questions. The Government did not contend that the taxpayer might not at some time be entitled to a deduction "either on account of a bad debt or for a business loss"; the "sole question in dispute was whether he was entitled to the deduction in 1925, the year in which his note was given, or in the later year in which the taxpayer's liability on the note is actually liquidated by payment."

The reasoning of this Court was broad enough to cover both aspects of the case. We said:

"For the purpose of a return upon a cash basis, there was no loss in 1925. As happily stated by the Board of Tax Appeals, the petitioner 'merely exchanged his note under which he was primarily liable for the corporation's notes under which he was secondarily liable, without any outlay of cash or property having a cash value.' A deduction may be permissible in the taxable year in which the petitioner pays cash. The petitioner says that it was definitely ascertained in 1925 that the petitioner would sustain the losses in question. So it was, if the petitioner ultimately pays his note."

We think that this decision is controlling in the instant case. As the return was on the cash basis, there could be no deduction in the year 1932, unless the substitution of respondent's note in that year constituted a payment in cash or its equivalent. There was no cash payment and under the doctrine of the *Eckert* case the giving of the taxpayer's own note was not the equivalent of cash to entitle the taxpayer to the deduction.

Respondent urges that his note was secured, but the collateral was not payment. It was given to secure re-

spondent's promise to pay, and if that promise to pay was not sufficient to warrant the deduction until the promise was made good by actual payment, the giving of security for performance did not transform the promise into the payment required to constitute a deductible loss in the taxable year. See *Jenkins* v. *Bitgood,* 101 F. 2d 17, 19.

The judgment of the Circuit Court of Appeals is reversed and the decision of the Board of Tax Appeals is affirmed.

*Reversed.*

MR. JUSTICE McREYNOLDS took no part in the decision of this case.