**ELROD SLUG CASTING MACH. CO. v. O'MALLEY, Collector of Internal Revenue.**

Civil Action No. 211.

District Court, D. Nebraska, Omaha Division.

Sept. 15, 1944.

Wm. A. Schall, Edward G. Garvey, and Gerald M. Vasak, all of Omaha, Neb., for plaintiff.

Joseph T. Votova, U. S. Atty., of Omaha, Neb., for defendant.

DONOHOE, District Judge.

The plaintiff in this action seeks to recover certain moneys paid by it as a corporation income tax for the years 1936, 1937 and 1938. The amounts involved are: $578.03, plus $37.24 interest, paid under protest April 11, 1938; $2,160.11, $189.62 penalty, and $186.33 interest, paid under protest December 13, 1939; and $533.97, plus $23.72 interest, paid under protest on June 8, 1940, together with interest on said amounts at the rate of 6% per annum from the dates of payment.

The basic question to be determined is the cost of certain patent rights acquired by the plaintiff upon which the amortized depreciation is allowed, and in addition the question of whether the plaintiff is chargeable with the sum of $3,228.40 added by the revenue department to plaintiff's income for the year 1937, which was collected and retained by the Ludlow Typograph Company of Illinois under certain written contracts with the plaintiff.

The evidence is largely in the form of written documents, except on the special defense of estoppel by contract asserted by the defendant.

The principal question that confronts the court is: What was the cost of the property, consisting of the invention and patent rights thereon, to the plaintiff?

The basic patent was issued on December 19, 1922, and improvements thereon on December 29, 1925 (plaintiff's exhibits 9, 10 and 11). Since the term of seventeen years runs from the date of the issuance of the patent for tax purposes, the plaintiff would be entitled to an amortized depreciation of 1/17th of the cost each year for the full term. The question of this cost first arose out of the tax assessment for the years 1922 and 1923. An investigation was then made by Internal Revenue Agent M. A. Bercovici, who then determined that the cost of the property to the plaintiff for tax purposes was the sum of $64,839.52. This report and finding was transmitted to the Commissioner of Internal Revenue at Washington, D. C., on July 10, 1926, by the revenue agent in charge, and was received by the Commissioner on July 13, 1926, and recorded in the Records Division of his office on July 14, 1926 (plaintiff's exhibit 1). The cost so arrived at and reported was seemingly accepted by the department, and an amortized depreciation in the sum of $3,814.09 was allowed each year thereafter up to and including the year 1930. For the years 1931 and 1932, this basis of depreciation or exhaustion was rejected by the department for the assigned reason that in a certain case wherein the plaintiff was petitioner, and the Commissioner of Internal Revenue was respondent, the United States Board of Tax Appeals, in determining the invested capital of the plaintiff, held that the initial cost of the patent was $10,200 (18 B.T.A. 1003) for invested capital purposes. The department has adhered to this position at all times since.

An action was brought involving the 1931 and 1932 tax, similar to the present action, and a settlement was arrived at and the case dismissed. A written instrument was signed by an attorney, representing the plaintiff in the case, in which the undertaking was to control future actions (defendant's exhibit 18). The defendant's special defense is based upon this instrument, and we shall have occasion to refer to it hereafter. A transcript of the evidence in the case before the Board of Tax Appeals has been received in evidence, marked plaintiff's exhibit 14.

A proper determination of the controversy necessitates a determination of when the plaintiff acquired title to the patent. When that is once determined, we may then proceed to determine the cost. Upon making a preliminary study of the record, all parties seemed to be agreed on the assumption that the title to the property was vested in the plaintiff by the assignment from Benjamin S. Elrod purporting to assign to the plaintiff, as a corporation, the application filed May 14, 1917, serial No. 168,546, dated July 31, 1917, and recorded in the Patent Office on August 3, 1917. However, from a study of the memorandum of Revenue Agent Bercovici, we observe the statement that while the stock was issued on the 1st day of August, 1917, the charter was not granted until August 15, 1917, at which time the Nebraska State Railway Commission instructed that no issue of stock for the patent would be permitted. This statement prompted the court to invite counsel to

submit additional evidence of the organization of the plaintiff. This has been done. A certified copy of the original articles of incorporation (defendant's exhibit 32) now appears in the record. The certificate of the Secretary of State discloses that it was filed in his office on the 15th day of August, 1917, or fifteen days after the articles of incorporation were executed. From the statement in the articles covering the general nature of the business to be transacted, it appears that the corporation was organized as a manufacturing corporation (see Bolton v. Nebraska Chicory Co., 69 Neb. 681, 96 N.W. 148), and as such, section 24-301 Compiled Statutes of Nebraska 1929, entitled "Corporations," governs. The statute requires that after the making of the certificate of organization, it shall be forwarded to the Secretary of State, and by him recorded. This is made a condition precedent to the transaction of any business. It need not be filed with the county clerk. Meyer-Cord Co. v. Hill, 84 Neb. 89, 120 N.W. 951. Until the certificate is filed and recorded, there is no charter. The law and the articles so filed, taken together, constitute the charter. The filing of the articles of incorporation is a condition precedent to the existence of any corporate franchise. Abbott v. Omaha Smelting & Refining Co., 4 Neb. 416. See also Livesey v. Omaha Hotel, 5 Neb. 50. The adoption of the articles, and any attempt to function as a corporation before the filing of the articles, as required by the law, in the manner specified, does not even create a corporation de facto. Hughes Co. v. Farmers Union Produce Co., 110 Neb. 736, 194 N.W. 872, 37 A.L.R. 1314. Consequently, under the law and the evidence, the plaintiff had no legal existence until the 15th day of August, 1917.

The contract (defendant's exhibit 31) was executed on the 31st day of July, 1917. The assignment (defendant's exhibit 30), in keeping with the terms of the contract, was executed on the same day it was filed for record in the Patent Office, on August 3, 1917. The assignment was ineffectual to pass title to the plaintiff for the simple reason that the plaintiff had no legal existence. The persons to the transactions may be said, as a matter of law, at the time of the transaction to be an association or a partnership, having in mind the creation of a corporation, but the corporation had not been formed and was not in existence. It needs no citation of authorities to support the proposition that the title to the property must have vested somewhere. It either did not pass from the grantor of the assignment, or if it did, it passed to the parties who contributed the consideration, whether we refer to them as an association or a partnership. The title to property never floats around in the air awaiting the construction of a landing place. It must vest somewhere. Since plaintiff was not then in existence, it could not vest in plaintiff and necessarily the title either remained in Mr. Elrod or vested in the members of the association or partnership in shares according to the contribution of the capital. As a consequence, we can only conclude that all parties were mistaken in the assumption that the plaintiff has had an existence since the 31st day of July, 1917. The plaintiff was born on the 15th day of August, 1917, and could only acquire or hold property of any species since said date. Having arrived at this conclusion, we may next proceed to determine when the plaintiff acquired the property, and what was the cost thereof.

The record does not disclose any evidence supporting the statement of Mr. Bercovici in his report that the Nebraska State Railway Commission instructed that no issuance of stock for the patent would be permitted on August 15, 1917, when the articles were filed. This is somewhat supported by the testimony of Lee Herdman before the Board of Tax Appeals (exhibit 14, page 27) in which in substance he said that after they put up the money that all parties interested spent their time in developing the invention. He seems to have no recollection of the issuance of the original $20,000 of capital stock. No doubt the stock was issued because the cancellation thereof was ordered by the Nebraska State Railway Commission at the time when the issuance of the $100,000 of common capital stock was authorized. However, whether such an issuance was made or not is a matter of unimportance. The statute specifically prohibited the issuance of any stock, or the transaction of or offering to do any business whatever in the state (except the preparing of the documents required by the act). See Revised Statutes of Nebraska, 1913, section 806, often referred to as the "Blue Sky Law."

There is little, if any, evidence in the record of any activity on the part of the corporation, as such, until the effort was made to obtain the permit from the Ne-

braska State Railway Commission as the law required. The cause for this delay may be found in the Tenth Annual Report of the Nebraska State Railway Commission, found in plaintiff's exhibit 4–A, being part V, entitled "Blue Sky Department", beginning on page 387 and continuing to 391 inclusive. From plaintiff's exhibit 1–A, it appears that no application was made for the permit, as required by the statute, in the office of the Nebraska State Railway Commission throughout the year 1917, nor up to the 31st day of December, 1918, when the application (plaintiff's exhibit 3) for permission to sell capital stock was presented to the Commission. It appears from plaintiff's exhibit 2–A that the application was considered, and the order set forth in said exhibit was made and entered. From the language of the order, it appears that the Commission considered the invention or patent rights belonged to Messrs. Elrod, Herdman and Rait, and by the fourth paragraph thereof it is provided that just as soon as a patent has been issued for the Elrod Slug Casting Machine that a due and proper assignment of said patent be made to the corporation, and proof thereof furnished to the Commission, together with a copy of the specifications from said patent as put out by the Patent Office generally. By the terms of the order, the plaintiff was authorized to issue $100,-000 of its capital stock with a par value of $100 per share to Messrs. Benjamin S. Elrod, Lee Herdman and Jas. E. Rait in payment for the assignment to the company of the patent rights to the Elrod machine, and in payment for their services in developing the device and in bringing it to its present perfection. There was a restriction on the stock that it should be held in escrow by a trustee to protect investors. It does not appear from the record when the assignments were made by these three gentlemen in keeping with the order of the Nebraska State Railway Commission, but it may be presumed that the assignments were properly made, since the license was granted and the stock issued.

We conclude therefore that the plaintiff acquired the title to the patent rights from the gentlemen, who as an association or partnership, orginally acquired an assignment of the invention, and that the cost thereof was one thousand shares of its capital stock with a par value of $100 per share, issued and delivered to them on or about the 18th day of January, 1919, which is the date of the receipt of the Omaha National Bank for said stock deposited in trust (plaintiff's exhibit 3–A). From this exhibit, it appears that the permit granted to the plaintiff was No. 332, which was accepted and agreed to by the plaintiff on the 7th day of January, 1919. (See second sheet of plaintiff's exhibit 3–A.)

Our conclusion also finds support in the notations of the Patent Office on exhibits 9, 10 and 11, which indicate that assignments of the patents were filed in the Patent Office. The assignee, Omaha Trust Company, referred to in exhibits 9 and 10, it will be remembered was the designated trustee under the order of the Nebraska State Railway Commission.

■ There seems to be no doubt but that the consideration for the invention and patent rights was the one thousand shares of common capital stock of the plaintiff with a par value of $100 per share. There is no evidence in the record indicating that the capital stock had an established market value. All of the common stock was issued to the three assignors of the invention and the patent rights in exchange for the property. Consequently, to determine the fair and reasonable market value of the stock, it is necessary under the law to take the value of the assets exchanged therefor. Champlin Refining Co. v. Commissioner of Internal Revenue, 10 Cir., 123 F.2d 202; Hazeltine Corporation v. Commissioner of Internal Revenue, 3 Cir., 89 F.2d 513; Commissioner of Internal Revenue v. Schumacher Wall Board Corp., 9 Cir., 93 F.2d 79.

■ This rule of law was recognized by Internal Revenue Agent M. A. Bercovici in his audit of the books and accounts of the plaintiff, as shown by exhibit J of plaintiff's exhibit 1. Exhibit J is a part of the exhibit received in evidence without objection, and purports to be an accurate account of the items going to make up the patent value. None of the items are in dispute, and this statement may be accepted as prime evidence of the facts disclosed thereby. In explanation of this exhibit, we find exhibit J–1, in the form of a supporting statement. While exhibit J–1 is not prime evidence of the facts related, it is competent evidence of the facts which the agent took into consideration, and the manner and method of his computation. Note his statement:

"The question arises as to the value for depreciation to be placed on this patent from the date of its issuance on 12/19/22.

"Under Sol. L O P 962, 2CB74 'the value of stock which has no market price may be estimated by resorting to the value of the assets and attendant circumstances which may affect the value of such assets'. It is difficult in this case to compute the value of the assets, the patent, for the reason that when the stock for it was issued, the invention covered by the patent had not yet been marketed and proven. The fact remains, and is borne out by subsequent events, that the invention had a great 'likelihood of practical usefulness.'
* * *

"Under the circumstances, the examining officer believes the use of the method suggested in Comm. Rec. 799 1–1 C–B 374 to be the fairest and has for the purpose of this examination used it. The earnings attributable to the patent itself were computed for the period Jan. 1, 1919 to Dec. 31, 1923 and capitalized though the patent itself was not granted until Dec. 19, 1922."

As heretofore stated, this report of the agent was submitted to the Commissioner of Internal Revenue and accepted. It was used for a number of years thereafter as the basis for amortized depreciation, and since no question has been raised as to the correctness of the computation as shown by exhibit J attached to the report, we shall accept said figures as accurate, and the computation of the depreciation value at the sum of $64,839.52, and hold that the annual amortized depreciation is in the sum of $3,814.09, as contended by the plaintiff.

Having come to this conclusion, it is perhaps not necessary to notice the contention of the plaintiff that the defendant is estopped from questioning the valuation since it was arrived at by its agent, and was accepted and to all intents and purposes approved for a number of years by the department. The contention of the plaintiff in that respect is without foundation in the law. While it is true that the defense of fraud or estoppel may be made sparingly, and in some respects, against the government in transactions involving its proprietary functions, still where the government acts in a governmental function, fraud or conduct working an estoppel on the part of its agents and officers may not be asserted against the government. The remedy, if any exists, must be pursued against such officers or agents for their remiss. The assessment and collection of revenues is a governmental function, and the doctrine of estoppel has no place here.

We now come to the defense of the defendant in substance that the finding and decision of the Board of Tax Appeals (Elrod Slug Casting Machine Company v. Commissioner of Internal Revenue, 18 B. T.A. 1003) became final, and is now res adjudicata as to the issue now presented, and that the plaintiff is estopped to deny the binding force thereof.

In the oral argument, and likewise in the written briefs, the defendant has receded from the contention set forth in the answer, and confines himself to the proposition that the decision was res adjudicata as to the date of acquisition, upon which the government relies.

We have carefully read the opinion of the Board of Tax Appeals in the case referred to, and are unable to discover any finding by that tribunal of the date of acquisition of the invention or patent rights. We do find, however, a finding that "the plaintiff was incorporated about August 1, 1917," and that the application for a patent on the device invented by Elrod was paid in for common stock of the par value of $10,200. An examination of the transcript of the evidence (plaintiff's exhibit 14) fails to disclose any competent evidence in support of the finding that petitioner was incorporated about August 1, 1917. That seems to have been only a mere assumption on the part of the member and the attorneys. Nowhere does it appear from any evidence when the articles of incorporation were filed, as required by the statute, or when the charter was granted. The only evidence touching the matter of the incorporation is found in the cross-examination of the witness, Lee Herdman, when in answer to the question "When did you incorporate?" he replied "We first proceeded to incorporate—I believe you stated in July but I was of the opinion in August, 1917." From this state of the record, it can only be assumed that the finding was made under a mistake of an assumed fact, and has no support whatever in the evidence. Consequently, it is of no force or effect, even if applicable, which seems to be questionable.

Finally, there is presented the defense of estoppel by written instrument. In support of this defense, the defendant offered in evidence defendant's exhibit 18, being

an authenticated copy of an agreement purported to be signed on behalf of the plaintiff by one Henry C. Moeller, as attorney for the petitioner, dated April 25, 1937, together with copy of the petition, answer of the government, entry of appearance of Henry C. Moeller, and stipulation for judgment in the case. By the stipulation, it was agreed that there were deficiencies, and that the Board might enter an order accordingly. This stipulation was filed on April 26, 1937. The instrument first referred to is as follows:

"In consideration of the Commissioner agreeing to deficiencies in tax of $516.32 and $303.24 for the years 1931 and 1932 in the above case before the Board of Tax Appeals the undersigned hereby agree to waive for all years subsequent to 1932 any claim for depreciation of the patent or patents owned by the Elrod Slug Casting Machine Company in 1931 and 1932 on which depreciation was claimed in the petition for those years."

This was signed Elrod Slug Casting Machine Company, by Henry C. Moeller, attorney for petitioner.

In connection with the waiver signed by Mr. Moeller, the plaintiff offered in evidence plaintiff's exhibit 15, which appears to be a photostatic copy of the power of attorney given by the plaintiff to the said Moeller, dated August 17, 1935, duly executed, from which it appears that the said Moeller was appointed and authorized by the plaintiff as its true and lawful attorney "to represent the corporation before any division of the Internal Revenue Department relating to income tax matters for the years 1931 and 1932." Defendant's exhibit 19 is identified as a report of a purported statement made by the attorneys representing the government in that action to their chief counsel. From the recommendation of settlement, we note the following:

"The petitioner's proposal contemplates stipulating deficiencies of $516.32 and $303.24 for the years 1931 and 1932, respectively, plus interest as provided by law."

In this report, nowhere does it appear that the petitioner proposed to waive a continuation of the claim in future years. It may likewise be noted that there is no reference to a waiver of subsequent years in the stipulation of settlement which was filed. The witness, Mr. Harold V. Thomas, testified that the instrument in question, signed by Mr. Moeller, was a collateral agreement. In other words, it had nothing whatever to do with the issue or issues involved in the case referred to in his power of attorney. To meet the issue thus presented, the plaintiff called the witness, M. L. Donovan, who testified that he was a practicing attorney; that he had been retained by the plaintiff to try the case, assisted by Mr. Henry C. Moeller, who then and theretofore had represented the plaintiff as an accountant, and practiced before the department; and in substance that before the case was called for trial, conferences had been held with the attorneys representing the government with a view to a settlement of the matter in controversy, at which Mr. Rait and Mr. Moeller were present with him representing the plaintiff; that at none of these conferences regarding a settlement was there any mention by any one in regard to the waiver of the taxpayer's right to depreciation for subsequent years to the years 1931 and 1932, which were involved in the case; that in the settlement, as finally arrived at, no mention whatever was made of, nor was the question of subsequent years involved; that all of the discussions and the settlement were specifically limited to the two years. The witness, in support of his statement, identified his letter to the plaintiff, marked plaintiff's exhibit 16, dated April 26, 1937, in which he expresses his disappointment over the settlement in the following language:

"I was disappointed that this matter was settled. However, as the settlement only covers the two years involved the same question will be up again later, at which time the issue should be squarely met."

Mr. Henry C. Moeller, who signed the instrument in question, was called as a witness, and in substance testified that he signed the document, but under the following circumstances: That at a conference held on Thursday afternoon before the Board met, at which there were present Mr. Rait and Mr. Elrod, the matter of a settlement was discussed, and that after such discussion Mr. Elrod authorized him to make the best settlement he could; that Mr. Elrod was anxious to get away and for that reason, among others, wanted the case settled; that an agreement was finally reached, and that the stipulation in evidence was drawn up, which was to be subject to the approval of the chief of the section; that after the stipulation was pre-

pared, Mr. Elrod consented to it and then left town; that during this conference, and all others preceding it, no mention was made by any one about waiving depreciation for the subsequent years; that after he signed the stipulation, the next he heard of the matter was on the following Friday afternoon, when he was told that the settlement would not be approved; that he then told the attorney "Now, this is a great time to renege on a thing like that" and "Mr. Elrod has left. We can't go to trial now," and they said "Well, you had better come down tomorrow morning and talk it over," so he went down on Saturday morning; that he was then asked to sign the waiver in question, but before doing so, he said to the attorneys that he had no power of attorney to bind these fellows except for the years involved; that they said to him "You will have to sign it anyway"; that at the time he signed this instrument Mr. Elrod had left for Texas relying upon the first stipulation of settlement, and that Mr. Rait had likewise left for Lincoln; that he did not have an opportunity to consult with either one of these parties.

Mr. A. H. Rait testified that he was the Rait referred to in the negotiations leading up to the settlement of the controversy for the years 1931 and 1932. He corroborated the testimony of the other witnesses with reference to the conferences leading up to the settlement; that in none of the conferences that he attended was there any mention about a waiver of depreciation for subsequent years after 1931 and 1932; that the stipulation of settlement for the years 1931 and 1932 was dated April 26, 1937, and was signed by Mr. Moeller in his presence and at his direction; that exhibit 18, with reference to subsequent years, was not seen by him until about a year later, when after receiving a notice from the government, he went to Mr. Moeller's office to investigate the intimated settlement; that he thereupon took Mr. Moeller to the revenue office and had a talk with Mr. Smith, and advised Mr. Smith that this was the first he had heard of any such waiver.

It will be observed that there is practically no dispute with reference to the circumstances under which this document, defendant's exhibit 18, was signed. The power of attorney is specific, and limits the power conferred. It needs no citation of authorities to support the proposition that without specific authority, def-

initely granted, Henry C. Moeller had no authority or power to bind the plaintiff by such an instrument. In fact, the evidence clearly shows that he wholly lacked such authority, and on that issue the finding will be for the plaintiff.

There is the one remaining issue growing out of plaintiff's second cause of action (paragraph 4 of the complaint), in which it is alleged, and by the answer admitted, that the defendant's technical staff added the sum of $3,228.40 to plaintiff's income tax for the year 1937, no part of which was received by the plaintiff. From the agreed statement of facts, the item grew out of the provisions of two certain contracts, as follows: In the contract of March 28, 1923 (plaintiff's exhibit 7), paragraph 1, it was agreed: "The parties hereto agree that all contracts, agreements and obligations between the parties hereto, which in any way relate to the above mentioned patents, are by this instrument terminated and that any and all claims which may have accrued to either of the parties under the terms and provisions thereof are hereby settled and satisfied, except that the party of the first part shall not be hereby released from any liability to reimburse the party of the second part for any damages sustained by it by reason of its having manufactured and sold machines described in and covered by the aforesaid applications and Letters Patent." And in paragraph 2: "The party of the first part hereby grants to the party of the second part, for the considerations and under the conditions hereinafter named, the sole and exclusive right to make, sell and use the machine described in and covered by the aforesaid applications and Letters Patent in the United States of America, for the full term of the patent rights, less one day."

Later, on the 15th day of September, 1925, the contract (plaintiff's exhibit 8) was entered into, in which the following quoted provision appears:

"The Elrod Slug Casting Machine Company is liable to Ludlow Typograph Company in Clause 1 of the agreement dated March 28, 1923, to reimburse the party of the second part for any damages sustained by it by reason of its having manufactured and sold machines described in and covered by the aforesaid applications and letters patent. It is mutually agreed between the parties hereto that this liability of Elrod Slug Casting Machine Company is hereby liquidated at ten thousand dollars

payable to Ludlow Typograph Company as follows:

"When in any year, beginning September 1, 1925, the total amount of royalties payable to Elrod Slug Casting Machine Company under the Domestic and Foreign Rights Contracts exceeds twelve thousand dollars, the surplus above twelve thousand dollars shall be retained by the Ludlow Typograph Company until the total amount of royalties so retained equals ten thousand dollars when the obligation of the Elrod Slug Casting Machine Company for such liability shall cease."

From these provisions it would seem that the obligation was incurred by the plaintiff under the provisions of exhibit 7, first above quoted; that the debt accrued thereafter, while the Ludlow Typograph Company had the exclusive right to make, sell and use the machine. On the 15th day of September, 1925, when the liability had fully accrued, it was liquidated at the sum of $10,000, and by the terms of that agreement the royalties which the plaintiff was entitled to receive under the form of the contract was limited to · the sum of $12,000 per year, the excess thereof in any one year to be retained by the Ludlow Typograph Company, and not paid to the plaintiff until the amount so retained equalled the obligation, at which time the liability should cease. In other words, it seems to us that a fair construction of the contract is that the plaintiff agreed to accept a lesser income until such time as the Ludlow Typograph Company was able to earn over and above the annual income a sufficient sum to satisfy the liability. As stated, nowhere does it provide for a payment to the plaintiff, nor is it contended or claimed that the plaintiff ever received any part of the item in question. The plaintiff, for tax purposes, was on a cash basis, and as such is chargeable only with the cash received. It would be entitled to credit for bad debts only when the debts were paid. The Supreme Court we think has decided this precise question. Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911; Helvering v. Price, 309 U.S. 409, 60 S.Ct. 673, 84 L.Ed. 836. While in these two cases, the issue was the same as here, it was approached from the other side. In both of these cases, the taxpayer was seeking a charge-off for bad debts of certain notes that they had given in satisfaction or renewal of former obligations. They were both on a cash basis. The decision of the court was that the giving of the notes did not satisfy the debt, and in effect that it merely constituted a change of the evidence of the debt; that the taxpayer, in reporting on a cash basis, was not entitled to charge off the items until those debts were paid. So here, this earning from plaintiff's property by a contract was waived or renounced to the extent of $10,000 before it was earned. The plaintiff never received any part of the sum, either directly or indirectly, and by the contract was not entitled to receive it. Under the principle announced in these cases, it would only be chargeable when money was received. In any event, no matter what view we take of the case, the final result is the same. Surely, if the plaintiff is chargeable with the receipt of this money, it is likewise entitled to credit for the payment thereof on a bad debt, and one side of the ledger would consequently balance the other. We therefore hold that the plaintiff was not chargeable with the item as a part of its income.

Judgment therefore will be for the plaintiff on each of the three different causes of action. The attorneys for the plaintiff are requested to prepare formal and specific findings of fact and conclusions of law in accordance with this memorandum. They are also instructed to compute the interest on the various items involved from the date of their payment at the rate of 6% per annum, and they will prepare a formal judgment embodying such amounts. Exceptions are allowed the defendant on all adverse findings and conclusions.