OPINION. Black, Judge: Issue No. 1. — The issues presented and the evi-dentiary facts, all of which were stipulated, have been previously stated and need not be repeated. It is our opinion that the respondent erred in holding that the cancellation and redelivery by Josey to Southern in 1938 of Southern’s note for $20,000 payable to Josey was a transaction from which Southern realized $20,000 of taxable income. We do not think Southern realized any taxable income on that transaction. The $1,900 of'liquidating dividends which Southern reported as income in 1938 and which has been accepted by the respondent as being correct is not in issue. This is not a case where a taxpayer, as the respondent contends, realizes income through the cancellation of indebtedness as provided for in article 22 (a)-14 of Eegulations 101.[1] Until the note was paid, either Southern or Josey had the right under their oral agreement to demand what was actually done in 1938. The situation here is somewhat analogous to the situation in those cases like Hirsch v. Commissioner, 115 Fed. (2d) 656, and Helvering v. A. L. Killian Co., 128 Fed. (2d) 433, where property was purchased partly on credit and in a later year, due to the property having greatly depreciated in value, the creditor settled for less than the amount originally agreed upon. The courts hold that substance rather than form is to be given controlling weight and that such a settlement is in essence a reduction of the purchase price. Of course, in the instant proceeding, Southern returned the 1,000 shares of National stock to Josey, so we could hardly say that the cancellation and return of the $20,000 note to Southern was a reduction of the purchase price, as Southern no longer owned the stock. We do think, however, that the return of the stock by Southern and the return of the note by Josey in 1938 were in substance a rescission of the 1929 purchase by Southern, resulting in neither gain nor loss, except for the $1,900 which is not in question. Just why Southern did not return to Josey the $1,900 which it received as a liquidating dividend on the stock, the stipulated facts do not show. But, inasmuch as there is no issue concerning this $1,900, we need not discuss it further. Neither the petitioner here nor its parent company, the Jesse H. Jones Co., received any tax benefit from the charge-off by Southern in 1933 of $17,190 as a loss from the worthless stock of National. If the Commissioner had disallowed this loss in its entirety it would not have affected the tax liability of either Southern or its parent company, Jesse H. Jones Co. We think the tax accounting question here is somewhat similar in principle to the tax accounting question in Dobson v. Commissioner, 320 U. S. 489. The taxpayer in that case in 1929 purchased 300 shares of certain stock. He sold 100 shares in 1930, sustaining a deductible loss of $41,000.80, which was claimed on his return for that year and allowed. In 1931 he sold another 100 sháres, sustaining a deductible loss of $28,163.78, which was claimed on his return and allowed. He retained the remaining 100 shares. In 1936 he learned that the purchase in 1929 had been induced by fraudulent representations. He filed suit against the seller and asked rescission of the entire transaction. In 1939 the suit was settled on a basis which gave him a net recovery of $45,150.63, of which $23,296.45 was allocable to the stock sold in 1930 and $6,454.18 allocable to that sold in 1931. He did not report any part of the recovery as income in 1939. Any adjustment of his 1930 and 1931 tax liability was barred by the statute of limitations. He had not, however, received any tax benefits from the charge-offs in 1930 and 1931. The Commissioner contended that the amount of the recovery attributable to the shares sold was income in 1939. The recovery upon the shares sold was not, however, sufficient to make good the taxpayer’s original investment in them. It was held that the taxpayer there realized no taxable gain from the recovery. The respondent’s determination on this issue is reversed. Issue No. t. — In assigning error as to this issue, petitioner alleges that respondent “erroneously disallowed a payment made by petitioner to the National Bank of Commerce of Houston” in the amount of $75,-000. Although the amount was deducted by petitioner in its return as a bad debt, the parties have briefed the issue from the standpoint of a statutory loss rather than a bad debt. Section 23 of the Revenue Act of 1938 provides that in computing net income there shall be allowed as deductions: (f) Losses by Corporations. — In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise. On tbe basis of the facts set out in our findings, all of which were stipulated, did Southern sustain a deductible loss of $75,000 during the taxable year 1938 ? We think it did. The payment of $75,000 by Southern to the bank in the taxable year 1938 had its origin in the October 12, 1928, contract between Colvin and Jones, who was acting on behalf of Southern and certain affiliated companies. That contract and any and all amendments or supplements thereto were rescinded and set aside by the three-party agreement of February 28, 1931, and the two supplemental agreements (Exhibits A and B) attached thereto. The details of these written instruments are set out in our findings of fact and need not be repeated here. The taxable year here involved is the calendar year 1938. Southern is not claiming as a loss in 1938 any of the payments made prior to 1938. Since it reports on the cash receipts and disbursements basis, we are of the opinion that Southern, in making the final payment of $75,000 in 1938 on its guaranty, sustained a deductible loss of that amount in the taxable year, and we so hold. Eckert v. Burnet, 283 U. S. 140; Helvering v. Price, 309 U. S. 409. See also I. T. 3252, C. B. 1939-1 (Part 1), p. 182. Issue No. §. — Did the exchange by Southern on June 1, 1939, of $640,000 par value of Main bonds for the Chronicle Building and leaseholds result in a capital gain or loss to Southern, and if so, how much ? The respondent determined that the exchange resulted in a taxable gain of $139,743.28 on the ground that Southern’s cost basis of the bonds was $260,256.72 and that the fair market value of the building and leaseholds was $400,000. The parties have stipulated that Southern’s cost basis of the bonds was $260,256.72, but petitioner contends that the fair market value of the Chronicle Building and leaseholds was “not more than” $213,107.33. Petitioner actually contends that the fair market value of the Chronicle Building and leaseholds was much less than $213,107.33, but, due to section 117 (d) of the Internal Revenue Code[2] and the stipulated fact that the net capital gain of Southern from other sales during 1939 was $45,149.39, the maximum deductible capital loss to Southern could not exceed $47,149.39, which is the difference between the cost of the bonds and the above mentioned amount of $213,107.33. What was the fair market value of the Chronicle Building and leaseholds on June 1, 1939? The respondent determined and still contends it was $400,000. Petitioner contends it was $110,000, but in any event not more than $213,107.33. We have found as a fact that the fair market value of the Chronicle Building and leaseholds on June 1,1939, was $260,256.72. . The evidence on this question consists of the ‘testimony of five witnesses for the petitioner and one for the respondfent, all supplemented by certain documentary evidence and some stipulated facts. We do not consider it necessary to review in detail all of this evidence. In arriving at our valuation of the Chronicle Building and leaseholds on June 1, 1939, we have given careful consideration to all of this evidence. We have concluded that there is no reason for disturbing the valuation which Southern Evidently put upon the property at the time of the exchange. It owned bonds of Main which had cost it $260,257.72, and in an arm’s length transaction it exchanged these bonds with Main for the Chronicle Building and leaseholds. It is fair to assume that in making the exchange it regarded itself as getting its money’s worth, and we think the evidence justifies a valuation finding which shows that it did get its money’s worth. It received property of a value equal to the cost of the bonds which it exchanged. In a recomputation under Bule 50, $260,257.72 will be used as the fair market value of the Chronicle Building and leaseholds at the time of the exchange. This means that Southern had neither gain nor loss on the transaction. IsHue No. 4- — Is Southern liable for the personal holding company surtax and penalty for the taxable year 1939? This depends on whether Southern is a “personal holding company” as that term is defined in sections 501 and 502 of the Internal Bevenue Code, the material provisions of which are in the margin.[3] As shown in our findings, petitioner’s gross income for the year 1939 was $385,998.36 and its persona] holding company income for the same year was only $132,799.08. Since this latter amount is less than 80 percent of petitioner’s gross income, it follows that petitioner is not a personal holding company for the year 1939 and is not liable for the personal holding company surtax and penalty for that year. It thus becomes unnecessary to decide several other questions briefed by the parties under this issue which would have been material if we had held that petitioner was a personal holding company for the year 1939. Issue No. 5. — The question here is whether Main realized any taxable gain on the exchange of the Chronicle Building and leaseholds on June 1,1939, for $640,000 of its own bonds, which it canceled. The parties have stipulated that Main’s adjusted basis of the property was $212,182.02 at the timé of the exchange. The respondent contends that Main was solvent both before and after the exchange and that, in line with United States v. Kirby Lumber Co., 284 U. S. 1, and similar cases, Main realized a taxable gain of $427,817.98, which represents the differencé between the adjusted basis of the property exchanged and the face value of the bonds which were received and canceled. Petitioner contends that it was insolvent both before and after the exchange and that in line with Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 Fed. (2d) 95, and similar cases, it realized no taxable gain on the exchange. The parties agree that the liabilities of Main before and after the exchange were $3,020,566.55 and $2,423,741.35, respectively. They also agree that the values of Main’s current assets before and after the exchange were $95,910.92 and $79,881.81, respectively. They disagree on the value of the land, buildings, and equipment. The respondent determined and contends that the values of such assets before and after the exchange were $3,250,000 and $2,850,000, respectively, whereas Main contends that the values of such assets before and after the exchange were considerably less than their depreciated book values of $2,598,998.76 and $1,878,081, respectively. The parties agree that the value of the separate properties on June 1, 1939, may be taken as the value of such properties both before and after the exchange. As stated above, the respondent determined these values to be $3,250,000, itemized as follows: Lamar Hotel Annex and leasehold- $375, 000 Loew’s State Theatre Building and leasehold- 650,000 National Standard Building and leasehold_ 750,000 Kirby Building and the land thereunder_ 1, 075, 000 Total value after exchange- 2, 850,000 Chronicle Building and leaseholds_ 400,000 Total value before exchange_ 3,250,000 Under issue No. 3 we found the fair market value of the Chronicle Building and leaseholds on June 1, 1939, to be $260,256.72. Under the present issue it will therefore only be necessary for us to determine from the evidence the fair market value on June 1, 1939, of the four remaining properties. Four of petitioner’s witnesses testified to values of these four remaining properties as of June 1,1939, as follows: [[Image here]] Ho'ux, a witness for# petitioner, and Rowe, a witness for respondent, testified to depreciated reproduction cost new values as of June 1, 1939, for the buildings only, exclusive of land and leaseholds, as follows: [[Image here]] Houx expressed no opinion as to the value of the land under the Kirby Building. Rowe thought the land alone was worth $514,800, which would bring his total values of the four properties up to $2,733,500. Burchfield’s $650,000 valuation of the Kirby property was divided $400,000 for the land and $250,000 for the building. We do not deem it necessary to fix a specific value for each of the above properties. We are convinced from all of the evidence that the fair market value of the land, buildings, and equipment before and after the exchange was not more than the depreciated book values of $2,598,998.76 and $1,878,081, respectively. On the basis of these values, petitioner was insolvent both before and after the exchange. Nothing, therefore, would be gained in taking up each property separately as we did in valuing the Chronicle Building and leaseholds under issue No. 3. The testimony of the several witnesses relative to the four properties now under consideration was of the same general nature as that given relative to the Chronicle Building and leaseholds, and we do not deem it necessary to review it in detail. The Commissioner strongly urges Lutz & Schramm Co., 1 T. C. 682, in support of his determination that Main received a profit of $427,-817.98 when it transferred to Southern the Chronicle Building and leaseholds, which had a cost basis to Main of $212,182.02, for bonds of Main having a face value of $640,000. We think Lutz & Schramm Co. is distinguishable on its facts. In that case during the course of our opinion we pointed out: “This petitioner was not insolvent and the question is not whether it realized income from the discharge or forgiveness of indebtedness, cf. United States v. Kirby Lumber Co., 284 U. S. 1; Lakeland Grocery Co., 36 B. T. A. 289; but is rather whether it realized gain from the disposition of a piece of real property.” In the instant case we have found that petitioner was insolvent both before and after its transfer of the Chronicle Building and leasehold for $640,000 face value of its own bonds. As was said in Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra: * * * In effect the transaction was similar to what occurs in an insolvency or bankruptcy proceeding when, upon a debtor surrendering, for the benefit of his creditors, property insufficient in value to pay his debts, he is discharged from liability for his debts. This does not result in the debtor acquiring something of exchangeable value in addition to what he had before. There is a reduction or extinguishment of liabilities without any increase of assets. There is an absence of such, a gain or profit as is required to come within the accepted definition of income. [Citing cases.] We think the instant case under issue 5 falls within the ambit of such cases as Dallas Transfer & Terminal Warehouse Co. v. Commissioner, supra, rather than within the ambit of Lutz & Schramm Co., supra, and we so hold. Decisions will be entered u/nder Rule 50. Art. 22 (a)-14. Cancellation of indebtedness. — (a) In General. — The cancellation of Indebtedness, In whole or In part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, income in the amount of the debt is realized by the debtor as compensation for his services. A taxpayer realizes income by the payment or purchase of his obligations at less than their face value. (See article 22 (a)-18.) In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt. SEC. 117. CAPITAL GAINS AND LOSSES. »»•**•» (d) Limitation on Capital Losses.— (1) Corporations. — In the case of a corporation, losses from sales or exchanges of capital assets shaU be allowed only to the extent of $2,000 plus the gains from such sales or exchanges. • * * SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY. (a) Generad Rule. — For the purposes of this subchapter and chapter 1, the term “personal holding company" means any corporation if— (1) Gross income requirement. — At least 80 per centum of its gross income for the taxable year is personal holding company income as definéd in section 502; * * * SEC. 502. PERSONAL HOLDING COMPANY INCOME. For the purposes of this subchapter the term "personal holding company income” means the portion of the gross income which consists of: (a) Dividends, interest (other than interest constituting rent as defined in subsection (g)), royalties (other than mineral, oil, or gas royalties), annuities. (b) Stock and Securities Transactions. — Except in the case of regular dealers in stock or securities, gains from the sale or exchange of stock or securities. • *•***• (g) Rents. — Rents, unless constituting 50 per centum or more of the gross income. * ♦ »