LEON and MARY ANN OHANESIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ohanesian v. Commissioner
Docket Nos. 14751-83, 14752-83, 14753-83.
United States Tax Court
T.C. Memo 1986-88; 1986 Tax Ct. Memo LEXIS 523; 51 T.C.M. (CCH) 551; T.C.M. (RIA) 86088; March 4, 1986. Leon Ohanesian, pro se. Irene Scott Carroll, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1977
$75,050
$37,525
1978
152,000
76,000
1979
11,807
5,903
After concessions the issues for decision are whether petitioners underpaid their 1977 and 1978 Federal income taxes by claiming a certain interest deduction in each year, and, if so, whether a portion of each underpayment was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are husband and wife and resided in Los Angeles, California, *525 when they filed their petitions herein. They filed joint Federal income tax returns for 1977 and 1978. As of the date of trial, petitioner Leon Ohanesian (petitioner) has been a real estate investor and developer for approximately 30 years. Petitioner completed high school and 6 months of college. He is an intelligent, sophisticated man possessing substantial business acumen. In or about 1966, petitioner met Hazel C. Ross (Ross), a former Wall Street stockbroker whose husband of 30 years had recently died. At that time, Ross was approximately 59 years old, and petitioner was approximately 31 years old. Petitioner and Ross spent considerable time together, and Ross fell in love with petitioner. At petitioner's request, Ross made loans to petitioner totaling approximately $171,400 from 1966 through 1971, including $60,000 on July 1, 1966. Substantially all of the loans were evidenced by 5-year unsecured promissory notes bearing interest at 12 percent per annum. Some of the notes required monthly interest payments, while others provided for payment of interest at maturity. Although petitioner initially made monthly interest payments to Ross on the earliest loans, he made *526 only nominal payments after 1967. On May 1, 1970, petitioner and Ross executed a "Note Extension Agreement" extending the maturity dates stated in the notes for 120 months.Under the agreement, neither interest nor principal would be payable until the extended maturity dates. Ross sued petitioner in Los Angeles County Superior Court on July 13, 1973, for payment on the original promissory notes. In her complaint she alleged that petitioner had obtained both the loans and the May 1, 1970 agreement through fraud. Petitioner filed a cross complaint for usury. The parties settled the suit on December 30, 1974, when petitioner stipulated to a judgment in favor of Ross for $200,000 plus $20,000 attorney's fees. The judgment dismissed with prejudice Ross' claims for payment on the notes. Petitioner made only nominal, if any, payments to Ross on the judgment. On March 3, 1977, Ross wrote a letter to petitioner indicating that she desperately needed funds and requesting payment of the judgment. Petitioner subsequently arranged to meet Ross on or about July 1, 1977. Petitioner brought to that meeting a personal check for $150,000 payable to Ross and marked "on account of accumulated *527 accrued interest"; a bank statement evidencing deposit of such amount in petitioner's checking account; two 8 percent unsecured demand notes payable from petitioner to Ross, one for $150,000 and one for $59,092.99; and an agreement that provided in pertinent part as follows: Leon Ohanesian as an individual, as maker of 15 certain promissory notes executed in favor of Hazel C. Ross as beneficiary, hereby agrees to tender the accumulated and accrued interest on said notes from the execution date of each respective note to July 1, 1977, in the following manner. A total cash amount of interest is to be remitted to the beneficiary immediately upon execution of this agreement by both parties and that amount shall be $150,000.00; and for the remaining unpaid accrued interest maker shall execute a promissory note in the amount of $59,092.99 which completes payment in full of the total accrued interest on said notes which amounts to $209,092.99. Said note to bear interest at the rate of 8% and shall be due and payable on or before 60 months from the date of execution. [2] The undersigned maker and beneficiary further agree that commencing July 1, 1977 the interest on said 15 promissory notes *528 shall bear interest at the rate of 8% and both principal and interest shall be on demand after July 1, 1977. From the execution date of each note the maker has been obligated for interest at the rate of 12% and said payment made pursuant to this agreement has been calculated at the said 12% interest rate. However all future calculations of interest shall be made at the 8% rate. Petitioner made an emotional appeal to Ross, cajoling her to sign the various papers he presented to her. Ross signed the agreement, [3] and petitioner paid Ross $500 cash. Petitioner subsequently deposited the check endorsed by Ross in his bank account. On December 14, 1977, Ross' counsel sent petitioner a letter demanding payment on the July 1, 1977 notes. Petitioner subsequently made only nominal, if any, payments on such notes. Petitioner and Ross met again on or about July 1, 1978. Petitioner brought to that meeting a personal check for $103,540.53 payable to Ross; a bank *529 statement evidencing deposit of $104,000 in petitioner's checking account; an 8 percent unsecured demand note for $103,540.53 payable from petitioner to Ross; and an agreement similar to the July 1, 1977 agreement. The July 1, 1978 agreement listed all notes payable to Ross previously made by petitioner, including the two July 1, 1977 notes, and provided as follows: The above notes are to continue to bear interest at the rate of 8%. The accumulated unpaid interest on the 15 notes dated prior to July 1, 1977 remaining due and owing is $59,092.99 which the maker herein agrees to tender to beneficiary upon execution of this agreement by both parties. Maker further agrees to remit accumulated interest on the $150,000 and $59,092.99 notes from July 1, 1977 to July 1, 1978 at the rate of 8% upon execution of this agreement and also to remit the earned interest on the 15 notes dated prior to July 1, 1977. Said interest being 8% accruing from July 1, 1977 to July 1, 1978. The interest on said 15 notes totalling $181,000 at 8% on $150,000 [sic] accruing from July 1, 1977 to July 1, 1978 is $12,000. The interest on $59,092.99 at the accruing rate of 8% from July 1, 1977 to July 1, 1978 totals *530 $4,727.54. Therefore, the total accrued and accumulated interest due to the beneficiary herein on all of the 17 outstanding promissory notes as of July 1, 1978 is $90,300.53 which is hereby remitted by maker to beneficiary. With this payment of interest the note for $59,092.99 is fully liquidated and there remains [sic] only 16 outstanding notes being on demand, bearing interest from July 1, 1978 at the rate of 8% with a total unpaid principal balance due of $331,000. The undersigned maker further agrees to remit the interest due to be earned for the balance of 1978 from July 1, 1978 to December 31, 1978 on the $331,000 unpaid principal balance. Thereafter, said $331,000 will accrue interest at 8% from January 1, 1979. The amount of said interest to accrue for the 6 months on said $331,000 is a total of $13,240 which when said amount is added to the accrued interest of $90,300.53 will now total $103,540.53 which is hereby tendered. The above terms conditions and provisions are hereby accepted and agreed to by the undersigned maker and beneficiary. Petitioner made an emotional appeal to Ross, cajoling her to sign the various papers he presented to her. Ross signed the *531 July 1, 1978 agreement, and petitioner paid Ross $500 cash. Petitioner subsequently deposited the check endorsed by Ross in his bank account. Petitioner made only nominal, if any, payments on the notes to Ross after July 1, 1978. As part of their Federal income tax returns for 1977 and 1978, petitioners filed Schedules C for petitioner's business using the cash method of accounting. On such schedules, petitioners deducted as interest on business indebtedness the $150,000 and $103,540.53 purportedly paid to Ross on July 1 of those years, respectively. In his statutory notice of deficiency dated March 22, 1983, respondent determined that these amounts were not paid or incurred as interest and that the underpayments in petitioners' tax were due to fraud. ULTIMATE FINDINGS OF FACT Petitioner did not intend to and did not in fact make payments of interest due to Ross in July 1977 and July 1978. He falsely claimed that such payments had been made, with the intent of evading taxes known to be owing for 1977 and 1978. OPINION At issue in this case are the deficiencies and the additions to tax for fraud under section 6653(b) resulting from petitioners' deducting as interest *532 certain amounts petitioner allegedly paid to Ross. The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily to protect the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. Fraud is an intentional wrongdoing motivated by a specific purpose to evade a tax known or believed to be owing. Akland v. Commissioner,767 F.2d 618, 621 (9th Cir. 1985), affg. a Memorandum Opinion of this Court; Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The requisite underpayment may result from an overstatement of deductions as well as an understatement of income. Neaderland v. Commissioner,52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). *533 The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Respondent issued the statutory notice of deficiency more than 3 years after petitioners filed their 1977 and 1978 tax returns. Accordingly, assessment is barred by the statute of limitations unless respondent proves, for each respective year, that petitioners filed a false or fraudulent return with the intent to evade tax. Section 6501(a), (c)(1); see Farmers Feed Co. v. Commissioner,10 B.T.A. 1069 (1928). [4] In the present case, respondent's burden of proof under section 6501 is *534 identical to that under section 6653(b). Considine v. United States,645 F.2d 925, 932 (1981), and cases cited therein.
Based on our consideration of the entire record, we conclude that respondent has proven by clear and convincing evidence that petitioners made an underpayment in their tax for both 1977 and 1978 and that a portion of each underpayment was due to fraud. Because petitioners used the cash receipts and disbursements method to compute the income or loss from petitioner's business, they are entitled to the interest deductions is issue only if petitioner paid such interest to Ross. *535 Sections 163(a), 461(a); section 1.461-1(a)(1), Income Tax Regs.; Eckert v. Burnet,283 U.S. 140 (1931). Petitioners argue that petitioner's presentation of the $150,000 and $103,540.53 checks to Ross at the July 1, 1977 and July 1, 1978 meetings, respectively, constituted payment of the interest. They assert that Ross was free to do with the checks as she pleased and that she chose to reloan the money to petitioner by endorsing the checks for petitioner. The parties argue at length over whether Ross actually endorsed the checks and signed the related agreements. Contending that the signatures were forged by petitioner, respondent points to Ross' testimony to that effect. Although we found Ross' testimony for the most part credible, her statements regarding the signatures were not reliable. She became so excited and disturbed when questioned about signing the documents that she repeatedly exclaimed that all of the documents were forgeries without considering the specific question asked her or examining the specific document before her. Petitioner points out that an Internal Revenue Service handwriting expert issued a written report concluding that the endorsement *536 signatures were Ross'. The expert did not testify at trial, however, and his report did not include the basis for his conclusions. The record is thus unclear as to the authenticity of the signatures. Because respondent bears the burden of proof, we have assumed that Ross' signatures were genuine. We nevertheless conclude that petitioner did not place the checks in Ross' control but only created the illusion of doing so to reduce petitioners' income tax liability. Although Ross undoubtedly made many imprudent loans to petitioner before the years in issue, circumstances had changed by that time. Petitioner failed to make any substantial payments on the initial notes; Ross sued petitioner and received a stipulated judgment; and petitioner failed to make any substantial payments on the judgment. By 1977 Ross badly needed funds, and petitioner made no substantial payments on the July 1, 1977 notes. We do not believe that Ross would have surrendered the checks to petitioner based upon his unsecured notes unless she had no option to keep them. Even if petitioner persuaded Ross to sign the documents at the meetings, we conclude that he neither intended to part nor actually parted *537 with the checks. Petitioner thus never paid any interest to Ross. All of the $150,000 purported interest payment in 1977 and $59,092.99 of the $103,540.53 purported payment in 1978 represented interest computed at 12 percent on the notes initially issued by petitioner. Each of these notes was dated before 1974 and the largest ($60,000) was dated July 1, 1966. The December 31, 1974 stipulated judgment, however, discharged petitioner's obligations on the notes, and under California law the judgment accrued interest at only 7 percent. Cal. Civ. Proc. Code sec. 682.1 (West 1980) (repealed 1983). We do not believe that petitioner, a shrewd businessman reluctant to satisfy his debts to Ross, could have inadvertently or gratuitously paid more "interest" to Ross than he was obligated to pay. Petitioner's own testimony illustrates that the "payments" to Ross possessed no economic substance other than the creation of an asserted tax deduction: Had I not intended to pay Mrs. Ross any of the interest as called for in the 1977 and '78 [agreements], I wouldn't have gone through the trouble to go out and take money out of savings banks and go through a transaction. *538 However, if Mrs. Ross had agreed at that time not to reloan the money back to me, * * * [t]he original $150,000 would have been for and in full settlement. And I would have had no interest payment to her, nor would I have a deduction. * * * Petitioner thus testified that, in exchange for Ross' reloaning him the $150,000, he agreed to incur the obligation to pay Ross ondemand approximately $380,493 ($171,400 principal amount of original notes plus $209,092.99 "interest"). We refuse to believe that petitioner would acquiesce in, much less propose, such an irrational agreement except as a means to reduce petitioners' tax liability without relinquishing control over the funds allegedly paid to Ross. Indeed, his former employee testified that petitioner characterized the July 1 transactions as "a way to get out of tax consequences." Although a desire to minimize taxes and an honest mistake of law do not constitute fraud, Mayock v. Commissioner,32 T.C. 966, 974 (1959), petitioners' underpayments were due not to an innocent mistake but to petitioner's deliberate and carefully crafted design. In this respect the present case is analogous to Professional Services v. Commissioner,79 T.C. 888 (1982). *539 The individual taxpayer in Professional Services claimed a deduction in 1976 for an amount purportedly paid for the purchase of materials relating to business trust organizations. The taxpayer "borrowed" the purchase price from an entity related to the seller of the materials, but neither the taxpayer nor the "lender" intended to create a bona fide debt. The taxpayer claimed deductions in 1977 for amounts purportedly paid but over which the taxpayer did not relinquish control. We concluded that both transactions involved payments in form only, not in substance, and upheld the Commissioner's determinations under section 6653(b) for both years. See Professional Services v. Commissioner, 79 T.C. at 912-917, 920-932. In United States v. Rosenthal,470 F.2d 837 (2d Cir. 1972), the Court of Appeals for the Second Circuit affirmed the conviction under section 7201 of a taxpayer who failed to report income from fraudulently obtained loans. The court concluded that an intent to evade taxes was established because the loans constituted taxable income and the defendant knew that he had taxable income equal to the amount of the loans. The court's decision *540 in Rosenthal rested upon a finding that the taxpayer had no intent to repay the loans. 470 F.2d at 842. The parties dispute whether petitioner intended to make payments on the notes given to Ross at the July 1 meetings. [5] Resolution of this issue, however, is not necessary for our decision. Even if, at the times petitioner gave the notes, he intended subsequently to make payments thereon, the understatements in petitioners' taxes resulted from their claiming deductions for alleged cash payments in 1977 and 1978 that never left petitioner's control. [6]
Petitioners argue that petitioner's cooperation and candor with respondent indicate that his conduct was not *541 fraudulent. Such conduct might be regarded as part of a continuing plan to shift the burden of taxation to Ross. Regardless of petitioner's actions after the years in issue, we have found that petitioner possessed the requisite mental state when he created the fictitious interest "payments" and filed tax returns claiming them as deductions. Because of concessions by the parties, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Contrary to this language, the $59,092.99 note was payable on demand, as our earlier finding reflects. ↩
3. As discussed in our opinion herein, it is not certain from the record that Ross signed all the documents.↩
4. Petitioners filed a separate petition for each of the years 1977, 1978, and 1979. A taxpayer relying upon the statute of limitations must so state in his pleadings. Rule 39, Tax Court Rules of Practice and Procedure.↩ Although petitioners alleged the statute of limitations in their petition for 1977, they did not do so in their petition for 1978. Moreover, the record indicates that petitioners may have agreed to a limited waiver of the statute with respect to 1978. Respondent does not raise these issues herein. In light of our holding, we need not resolve them.
5. Subsequent to trial of this case, petitioner filed a proceeding in bankruptcy. We do not know what, if any, effect that proceeding had on his debts to Ross. ↩
6. Petitioners do not argue that the execution of the notes constituted deductible payment of interest. Such an argument would be erroneous. See Helvering v. Price,309 U.S. 409 (1940); Wilkerson v. Commissioner,655 F.2d 980 (9th Cir. 1981), revg. on a more specific issue 70 T.C. 240↩ (1978).