## PRICE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4480.

Circuit Court of Appeals, Fourth Circuit.

Aug. 28, 1939.

George D. Brabson, of Washington, D. C., and Julius C. Smith, of Greensboro, N. C. (C. R. Wharton, of Greensboro, N. C., and D. H. Blair, of Washington, D. C., on the brief), for petitioner.

Berryman Green, Sp. Asst. to Atty. Gen. (Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER and NORTHCOTT, Circuit Judges, and H. H. WATKINS, District Judge.

PARKER, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals, approving a deficiency assessment for the year 1932. The question involved relates to the deductibility of a loss which taxpayer claims to have sustained in that year on a contract of guaranty previously executed. The Board denied the deduction on the ground that taxpayer, who made his return on the cash receipts and disbursements basis, gave a note covering the loss and that this note was not paid until the year following.

The taxpayer, Julian Price, is president of the Jefferson Standard Life Insurance Company, which in the year 1929 was a large stockholder in the Atlantic Bank and Trust Company of Greensboro, N. C. In September 1929 the last named institution was merged with the North Carolina Bank and Trust Company; and pursuant to the plan of merger certain assets of the Atlantic Bank, called "A" assets, were accepted conditionally by the North Carolina Bank and certain other assets, called "B" assets, were pledged to that bank with authority to charge against them any losses which might be established in the "A" assets. At the same time, taxpayer and three other stockholders of the Atlantic Bank executed a guaranty agreement to the effect that, if the North Carolina Bank failed to realize a certain sum from the "A" assets within two years, they would make up the deficiency so ascertained in an amount not exceeding $500,000. The period for realizing on the "A" assets under the terms of the guaranty was

subsequently extended for an additional year, or until sometime within the year 1932.

In June 1931, the president of the North Carolina Bank advised the four guarantors that the "B" assets were not in such shape that the bank could use them to the extent necessary for banking purposes, and requested them to put their guaranty into bankable form so that it could be used by the bank to obtain credit. Whereupon taxpayer executed and delivered to the bank his note for $125,000 and indorsed the note of C. W. Gold, another one of the guarantors, for a like amount. He also borrowed from his wife certain stocks which he deposited as collateral security to the notes. At this time, the "B" assets were still pledged as security for realization on the "A" assets; and in August 1931 they were valued upon an appraisal at $529,947.44, or an amount in excess of the guaranty made by taxpayer and his fellow guarantors. The Board finds that: "At the end of 1931, the guaranty agreement was still in force and effect. The 'B' assets were still in the hands of the North Carolina Bank, as trustee, and were still in the process of collection. No demand had ever been made upon petitioner for the payment of any part of his obligation under the guaranty. While it was known that there would be some loss to the guarantors it was not definitely known throughout 1931 what the amount of the loss would be, and the guarantors had every reason to believe there would be a substantial reimbursement from the 'B' assets of any losses."

Financial conditions in Greensboro took a turn for the worse in the early part of 1932, collections on the "A" and "B" assets declined and it was soon apparent that there was no possibility of recovering anything further from the "B" assets. Consequently the North Carolina Bank decided to make collection on the guaranty as to the "A" assets, and called the guarantors to make good their guaranty. Taxpayer, thereupon, executed his note for $250,000 to the bank in settlement of his liability and that of Mr. Gold, upon whose note he was indorser; and the finding of the Board with respect to this crucial matter is as follows:

"In the latter part of March, 1932, petitioner, in his discussions with officials of the North Carolina bank, was informed that the bank had decided that the pos-

sibilities of collecting anything on the 'B' assets were remote and that there was no hope of any relief from these assets. The bank requested that petitioner make a *final settlement* of his obligation under the two notes and the guaranty to the bank. Petitioner proposed to pay the two notes (his own note and Gold's note on which he was endorser) by giving the bank his note for $250,000. The bank accepted, and the C. W. Gold note in the amount of $125,000, endorsed by petitioner, and petitioner's individual note in the same amount were paid by the note of petitioner in the amount of $250,000, dated March 28, 1932. Upon the delivery of this note for $250,000 the bank marked 'paid' and turned over to petitioner the two notes which had been executed under the guaranty agreement. Both petitioner and the bank considered this to be a final payment of the two notes given under the guaranty."

Taxpayer at first deposited as collateral with the $250,000 note the stocks which he had borrowed from his wife and deposited as collateral to the accommodation notes given by himself and Gold in the preceding year. In the following December, however, he substituted securities of his own in lieu of these. In November 1933, the note was transferred by the Conservator of the Bank to taxpayer's wife and daughter and was held by an agent as trustee for them at the time of the hearing before the Board.

Taxpayer deducted only $125,000 as a loss on account of this transaction in 1932, that being his individual loss as guarantor; and the propriety of that deduction is the only matter before us. The $125,000 that he paid on account of his indorsement for C. W. Gold he deducted as a loss in 1933; and that deduction is not here in controversy. As to the propriety of deferring the latter deduction until 1933, it appears that Gold died in 1932 and it was necessary for taxpayer to look to his estate for reimbursement. Not until 1933 did it become apparent that the estate was insolvent and that taxpayer could expect no reimbursement therefrom.

Upon these facts the only question that arises in the case is when did the taxpayer sustain the $125,000 loss on his guaranty. We think it clear that he sustained it in 1932. He did not sustain it in 1931, because at that time it was not definitely ascertained that he would sustain a loss, or, if so, what the loss would

be. He did not sustain it when he paid the note; for that was but the payment of a debt incurred when the loss was sustained, and we have recently held that the payment of a debt results in no deductible loss. United States v. Little War Creek Coal Co., 4 Cir., 104 F.2d 483.

How a deductible loss must be evidenced is thus set forth in Regulations 86, Article 23(e): "In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed." And see Rhodes v. Commissioner, 6 Cir., 100 F.2d 966, 969. The loss sustained by the taxpayer in 1932 falls squarely within the terms of this regulation. The guaranty given the bank and the payment thereunder were closed and completed transactions. The closing was fixed by an identifiable event, viz., the giving of the $250,000 note as the primary obligation of the taxpayer, and not as a mere guaranty or accommodation, and the surrender of the two notes which had been executed under the guaranty agreement. There can be no question as to the loss being "bona fide and actually sustained" within the period. The Board finds that "The bank requested that petitioner made a *final settlement* of his obligation under the two notes and the guaranty to the bank," and that, when petitioner delivered his note for $250,000 and the bank turned over to him the two notes which had been executed under the guaranty agreement, "Both petitioner and the bank considered this to be a final payment of the two notes given under the guaranty." Prior to this transaction taxpayer was liable on his guaranty and on the two notes given as accommodation thereunder; but his loss under the guaranty had never been determined and his liability was of a secondary character, for even on the notes executed in 1931 he was liable only as an accommodation maker. In giving the $250,000 note, however, he faced realities and accepted his loss. His liability on the note thus executed was primary and unconditional.

The fact that taxpayer instead of meeting his loss with a cash payment gave a note in settlement, does not change the situation as to when the loss occurred; for the giving of the note could not postpone the loss. The loss was accepted and the note given created a bona fide indebtedness of an entirely different character from that which had theretofore existed. It will not do to say that taxpayer sustained the loss when he paid the debt and not when he incurred it for the purpose of meeting the loss; for one does not sustain a loss by merely paying a debt for which he himself is primarily liable, nor is the loss deferred by contracting a debt with which to pay it. The able attorney representing the Commissioner very properly admitted on the argument that, if taxpayer had obtained the $250,000 to meet the loss by giving the note to another bank, he would have been entitled to the deduction claimed; but surely his right to the deduction cannot depend upon the identity of the bank which extends credit to him.

It is argued that the fact that taxpayer is on the cash receipts and disbursements basis instead of the accrual basis makes a difference; but we do not think so. The question is not one of accruing a loss to occur in the future, but of dealing with a loss that has already occurred; and, as heretofore stated, the occurrence of the loss cannot be said to be postponed merely because credit is obtained with which to meet it. This seems very clear if a simple illustration be taken: If A and B, indorsers on the note of an insolvent corporation, are called for payment, and A discharges his half of the liability in cash while B gives his individual note, payable in the following year but amply secured (as was the case here) in discharge of his liability, can it be said that the loss is sustained by A in one year and B in the next? To ask the question is to answer it. Any such rule would not only shock the common sense of practical men, but would also put it within the power of a taxpayer to spread losses of this character over a number of years, by the simple expedient of giving a note or notes in settlement of the loss and claiming deductions as the notes are paid.

There is a difference, of course, between a mere postponing of a pending loss on a secondary obligation and meeting the loss, as the taxpayer did here, with the execution of a primary obligation. In the one case, the loss may never be sustained; in the other, it is sustained when the primary obligation is given. True, a taxpayer on the cash receipts and disbursements basis cannot be said to have sustained a loss until he has parted with money or money's worth; but when he executes

a bankable note, secured by collateral, he has parted with money's worth. The value of his estate is decreased by the amount of the note as a result of the transaction.

The facts of the case, in final analysis, amount to a borrowing by taxpayer from the bank of funds with which to meet the liability on his guaranty and the application of the proceeds of the loan to that purpose; and we know of no principle of law or of justice which would deny him the right to deduct the loss arising from his guaranty until the loan is repaid. A case very much in point is Crain v. Commissioner, 8 Cir., 75 F.2d 962, 963. In that case taxpayer and another became obligated to pay obligations of a corporation in which they were stockholders in the sum of $80,000. In 1916 the other person paid the $80,000 in cash and took taxpayer's note for $40,000, which taxpayer did not pay until 1919. Taxpayer sought to take deduction for his part of the loss in the year 1919 when he paid the note. In holding that he might not do this, the court said:

"But in the year 1916, the amount of loss sustained became definitely certain, and the whole of it was actually paid by Wesson. Since the taxpayer did not himself have on hand enough cash to pay his half, he agreed with Wesson that the latter should advance all of the money in payment of the loss, and the taxpayer would make to Wesson a note for the taxpayer's half of such loss.

"In fair effect, what the taxpayer did in 1916 was to borrow $40,000 in money with which to pay the loss, now here in dispute, as to the date of its accrual for taxing purposes. It seems clear, from the facts here and the ruled cases, that the loss occurred in 1916. Avery v. Commissioner, C.C.A. [5 Cir.] 22 F.2d 6, 55 A. L.R. 1277; Darling v. Commissioner, C. C.A. [4 Cir.], 49 F.2d 111. Did the giving of the note to Wesson have the effect to lawfully postpone deduction of the loss from income till the year in which the note was paid?

\* \* \* \* \* \*

"If the taxpayer had himself actually paid in cash his part of the loss in 1916, it would hardly be contended that he could not, in that year, have charged the sum paid as a proper deduction from his income for that year. It is difficult to see how the situation was changed merely because he was forced to borrow money from another with which to pay his part of the loss."

Another case very much in point is Jenkins v. Smith, D.C., 21 F.Supp. 433, 434. In that case a taxpayer had executed a bond to a bank in precarious condition guaranteeing the deposit of collateral which was to become the property of the bank in the event of its insolvency. The bank became insolvent and its affairs were taken over by another bank, which called upon taxpayer to make good his obligation under the bond. He thereupon executed his note to the last named bank to borrow a sufficient sum to meet the obligation and gave his check in extinguishment thereof. It was held that a deductible loss resulted. The court said:

"The deduction was proper and plaintiffs must prevail if, under all the circumstances, the obligation on the bond was paid. The defendant urges, however, that there was no payment in fact, but only in form, since the decedent remained obligated to the First National Bank & Trust Company for the same amount, evidenced by a new note. He parted with no cash in 1933, but merely borrowed from his payee in order to pay the same payee.

"In my opinion, the obligation on the bond was discharged by the acceptance by the First National of the check as payment. Where or how the decedent obtained the money with which to make the check good is immaterial. The acceptance of the check as payment discharged the obligation, even though it created an overdraft. A new cause of action arose upon the check. The First National could no longer have sued the decedent on the bond. The bank knew of the overdraft, but was satisfied to take its chances on the new obligation. The bond transaction was closed.

"The credit to the decedent's account, made on the same day, was the result of a new transaction, initiated by a promissory note to the bank secured by new collateral. It was in no sense an extension of time for payment of the old debt. It was a new contract of a substantially different nature."

Directly in point is the Board's decision in A. W. D. Weis v. Commissioner, 13 B.T.A. 1284. In that case, as here, taxpayer kept his books on the cash receipts and disbursements basis. A partnership in which he was interested failed in the year 1919, and he was called by a bank

for the payment of partnership paper up-on which he was liable and gave the bank his personal note, which was renewed from time to time and not paid until 1923. The Board said:

"We are of the opinion that all the losses here in question were sustained in the years in which the several investments became worthless. In such respective years each of the deals became a closed trans-action and the petitioner's net assets were reduced in the amount of the loss sus-tained. It is not material whether such losses were met by the payment of cash from funds in hand or with cash borrow-ed from the bank and evidenced by notes payable in a subsequent year. The loss had been sustained and the transaction had been closed by a cash payment. The use of the petitioner's credit to secure funds from the bank was a new and different deal and had no more to do with the peti-tioner's tax liability than any other bor-rowing that he did in the taxable year."

The Weis case deals with another sit-uation which demonstrates the unsound-ness of the general proposition that a tax-payer on a cash receipts and disbursements basis cannot be said to sustain a loss so long as he does not meet the loss with a cash payment. In a transaction sepa-rate and distinct from the one described, taxpayer had given his note for $37,500 to a corporation for stock issued to him. The corporation went into bankruptcy in 1921 and taxpayer's investment therein be-came a total loss in that year although he did not pay the note until 1925. It was held that he was entitled to take deduction for the loss in 1921 and not in 1925.

The chief reliance of the Commission-er is the decision of the Supreme Court in Eckert v. Burnet, 283 U.S. 140, 51 S.Ct. 373, 374, 75 L.Ed. 911; but we do not regard that decision as controlling here. In that case the taxpayer and another were indorsers on paper of a defunct cor-poration. They executed a joint note to the bank, and destroyed the old notes. Tax-payer sought to deduct half of the sum of these notes as a worthless debt. The court said: "The petitioner treats the case as one of an investment that later turns out to be bad. But in fact it was the satisfaction of an existing obligation of the petitioners, having, it may be, the consequence of a momentary transfer of the old notes to the petitioner in order that they might be destroyed. It is very plain we think that the words of the stat-ute cannot be taken to include a case of that kind." The court went on to say further: "As happily stated by the Board of Tax Appeals, the petitioner 'merely ex-changed his note under which he was pri-marily liable for the corporation's notes under which he was secondarily liable, without any outlay of cash or property having a cash value.' A deduction may be permissible in the taxable year in which the petitioner pays cash. The petitioner says that it was definitely ascertained in 1925 that the petitioner would sustain the losses in question. So it was, if the peti-tioner ultimately pays his note. So was the tax considered in United States v. Mit-chell, 271 U.S. 9, 12, 46 S.Ct. 418, 70 L.Ed. 799, but it could not be deducted until it was paid."

We consider this case as definite au-thority only for the holding that a loss of the character set forth is not deductible under the "bad debt" provision of the stat-ute (Burns Mfg. Co. v. Commissioner, 9 Cir., 59 F.2d 504, 507), although the lan-guage does indeed go further and lay down the proposition that where there is a mere deferring of a loss by the renewing of an obligation, the loss may not be deducted until the obligation is paid, a proposition which we are not disposed to question. That it was not intended to prevent by that decision the taking of a loss in a case such as this, where the loss is evidenced by a closed transaction, but merely to pre-vent the taking of a supposed loss which has never been realized, is indicated by the decision in Burnet v. Logan, 283 U.S. 404, 413, 51 S.Ct. 550, 552, 75 L.Ed. 1143, where the court refers to the Eckert de-cision as follows: "Ordinarily, at least, a taxpayer may not deduct from gross re-ceipts a supposed loss which in fact is rep-resented by his outstanding note. Eckert v. Commissioner of Internal Revenue, ante, 283 U.S., p. 140, 51 S.Ct. 373, 75 L.Ed. 911. * * * And, conversely, a promise to pay indeterminate sums of money is not necessarily taxable income. 'General-ly speaking, the income tax law is con-cerned only with realized losses, as with realized gains.'" In other words, the tax-payer may not take deduction for a loss where what he has done is merely to post-pone the evil day of reckoning. He may take the deduction where he has met the evil day and the loss has been realized. The fact that he borrows money to meet it is immaterial; the fact that he borrows to meet an outstanding obligation out of

which the loss arises is immaterial; and the fact that he borrows from the person to whom the obligation is due is immaterial, provided that there is, as there was here, a real payment of such obligation in money or money's worth and not a mere extension or renewal.

The Commissioner relies also upon Jenkins v. Bitgood, 2 Cir., 101 F.2d 17, and Hart v. Commissioner, 1 Cir., 54 F.2d 848. The former relates to the deductibility of losses in stock for which a note was given in payment. It has no applicability to the case at bar except in so far as certain reasoning of the opinion may be persuasive. In this connection, however, we will say that we are not impressed with the reasoning that a taxpayer may not deduct in the year in which it occurs a loss sustained as the result of a purchase of stock, merely because he has given his note for the purchase of the stock payable in a succeeding year. The Hart case deals with the deductibility of interest, where the interest is not in fact paid but a note is given for it. This, of course, is a mere deferring of payment and not at all the sort of thing involved in the transaction before us.

The whole question in the case at bar comes to this: Was there a mere postponement of the loss by the renewal of the existing obligation? Or was there a realization of the loss by the discharge of the existing obligation and the assumption by taxpayer of an independent obligation of a different character? We think that the latter is the case. The loss arising out of the guaranty given the bank was liquidated and discharged by the taxpayer. He discharged that liability, not with money, but with money's worth, i. e. with his bankable note amply secured by collateral. The case is no different from what it would have been had he borrowed money from another bank on this note and used the proceeds for the purpose for which he used the note itself. The old obligation was not carried forward nor was the taking of the loss postponed. The loss was actually sustained when the liability on the guaranty was met and discharged; and it cannot affect taxpayer's right to deduction on account thereof that he met it by what was in effect a borrowing of money.

For the reasons stated, the decision of the Board will be reversed.

Reversed.