Richard D. Lord and Mildred Lord v. Commissioner.
Lord v. Commissioner
Docket No. 5642-67.
United States Tax Court
T.C. Memo 1970-152; 1970 Tax Ct. Memo LEXIS 209; 29 T.C.M. (CCH) 653; T.C.M. (RIA) 70152; June 11, 1970, Filed David W. Sandell, 4400 Seattle First Nat'l Bank Bldg., Seattle, Wash., for the petitioners. Millard D. Lesch, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Fiseal Year Ended
Deficiency
12-31-61
$ 3,447.95
12-31-62
13,303.73
12-31-63
125.21
Concessions having been made, the only remaining issue herein is whether 1963 or 1965 is the proper year for a loss deduction which resulted from petitioners personally guaranteeing certain debts of their Subchapter S corporation. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference. Richard D. Lord and Mildred Lord, *211 petitioners herein, are husband and wife residing in Seattle, Washington. They are cash basis taxpayers and for the calendar years 1960 through 1965, filed joint individual income tax returns with the district director of internal revenue at Tacoma, Washington. Modern Refrigeration Company, Inc. (hereinafter sometimes referred to as Modern) is a corporation which was incorporated in the State of Washington on October 2, 1961. Modern was a distributor of refrigeration equipment for Hussmann Refrigeration, Inc. (hereinafter sometimes referred to as Refrigeration, Inc.). Richard was president of Modern and he and Mildred owned 50 percent of its outstanding stock. The remainder of the stock was owned by either Joseph L. Parutto (hereinafter sometimes referred to as Joseph) or by Joseph and his wife Ruth. Modern elected to be taxed under section 1372 [1] (Subchapter S) for its taxable years beginning October 2, 1961. Richard and Joseph jointly owned the real property located at 200 Second Avenue West, Seattle, Washington (hereinafter sometimes to as 200 Second Avenue). The property at *212 200 Second Avenue was subject to a first mortgage. On October 2, 1961, Richard and Joseph leased the property located at 200 Second Avenue to Modern. On December 20, 1961, as an inducement to Hussmann Refrigerator Company (hereinafter sometimes referred to as Refrigerator Company) and Refrigeration, Inc., to extend credit to Modern, Richard, Mildred and Joseph, guaranteed the obligations of Modern to Hussmann Acceptance Company (hereinafter sometimes referred to as Acceptance Company). As a result of financial difficulties, Richard and Joseph, on August 9, 1963, executed a chattel mortgage in trust and a common law assignment of Modern's assets to the Seattle Association of Credit Men. A sale of Modern's assets was subsequently held on October 22, 1963, at 200 Second Avenue. Also on August 9, 1963: (1) Richard executed an assignment of his claims against Modern in favor of Refrigeration, Inc., Refrigerator Company and Acceptance Company (hereinafter sometimes referred to collectively as the Hussmann Companies); (2) Richard, Mildred, Joseph and Ruth made, executed and delivered a second mortgage upon 200 Second Avenue in favor of the Hussmann Companies; and (3) Richard, Mildred *213 and Joseph entered into an agreement and release with the Hussmann Companies. The second mortgage on 200 Second Avenue provided in part that: The obligation of this mortgage shall mature and become payable at the time of and upon the day that the assets of Modern Refrigeration Co., Inc., are finally liquidated in a pending insolvency liquidation. In any event, this mortgage shall 654 become payable not later than October 1, 1964. The Mortgagors do hereby covenant that they are lawfully seized of an indefeasible estate in fee in the said described property, that the same are free of any encumbrances save and except a first mortgage thereon, the unpaid balance of which is in the approximate sum of $25,000.00. The Mortgagors do further warrant the usual covenants to the same extent as a statutory warranty deed under the laws of the State of Washington and all covenants herein made and that they will defend against any breach of any or all of the same. The Mortgagors further covenant and agree as follows: * * * 6. Mortgagors covenant and agree to promptly perform all of their obligations under the aforesaid first mortgage and to pay all sums which shall become due thereon *214 promptly when due and at the request of the Mortgagees shall furnish proof of such payment to the Mortgagees herein. 7. In the event that the obligations secured hereby shall not be paid punctually when due, or in case of any other default under the terms of this mortgage, then and in such case proceedings may forthwith be had by the Mortgagees for the recovery of said obligations by foreclosure of this mortgage and in any decree of foreclosure of this mortgage, all costs, including reasonable attorney's fees, shall be included in the judgment, and in case such foreclosure suit is settled before judgment is recorded therein, such costs shall nevertheless be paid; provided, however, that the Mortgagees [sic]* shall not be liable for any deficiency which may remain in the aforesaid obligations secured hereby after a sale of the property in said foreclosure proceedings. * Probably should read "Mortgagors." The agreement and release of August 9, 1963, provided: Agreement and Release BY THIS AGREEMENT, made and executed this 9th day of August, 1963, by and between RICHARD D. LORD and MILDRED LORD, his wife, and JOSEPH L. PARUTTO, whose wife is RUTH D. PARUTTO, hereinafter referred *215 to as "First Parties," and HUSSMANN REFRIGERATION, inc.,/ a Missouri corporation, HUSSMANN REFRIGERATOR CO., a Missouri corporation, and HUSSMANN ACCEPTANCE CO., a Missouri corporation, hereinafter referred to as "Second Parties, WITNESSETH: WHEREAS, the First Parties are the sole shareholders of all of the capital stock of Modern Refrigeration Co., Inc., a Washington corporation; and WHEREAS, on December 20, 1961, the First Parties made, executed and delivered to Second Parties an agreement of guaranty in writing, under the terms of which the First Parties unconditionally guaranteed to the Second Parties the faithful and prompt performance, payment and discharge of all obligations of Modern Refrigeration Co., Inc., to Second Parties; and WHEREAS, Modern Refrigeration Co., Inc., is presently indebted to Hussmann Refrigeration, Inc., and Hussmann Refrigeration Co. upon open account in the sum of $151,380.36 and upon an unpaid promissory note in the principal sum of $10,000.00, bearing interest at 5% per annum, and is further obligated to Hussmann Acceptance Co. on a contingent liability arising from a recourse assignment of conditional sales contracts, notes, chattel mortgages *216 and other commercial paper by the Modern Refrigeration Co., Inc., to Hussmann Acceptance Co., the unpaid balances on such commercial paper totalling in the aggregate $1,019,805.31, against which there are reserves of $38,863.73; and WHEREAS, Modern Refrigeration Co., Inc., is hopelessly insolvent and is presently initiating proceedings for the liquidation of the assets of the corporation so that the same can be ratably and proportionately distributed to the creditors of the corporation; and WHEREAS, in order to secure the obligations of the First Parties under the terms of said Guaranty Agreement, the First Parties have made, executed and delivered a mortgage upon certain real estate belonging to them, subject to a first mortgage of approximately $25,000.00, which mortgage given and delivered to the Second Parties bears even date herewith; and WHEREAS, to further secure their obligations under said Guaranty Agreement the First Parties have made, executed and delivered to the Second Parties an assignment of their creditor's claim against Modern Refrigeration Co., Inc., which claim appears upon the books of said corporation in the aggregate amount of $50,632.62, which claim is *217 represented by promissory notes payable to Richard D. Lord in the principal sum of $26,518.40 and to Joseph L. Parutto in the principal sum of $24,114.22; NOW, THEREFORE, in consideration of the mutual covenants and 655 agreements herein contained and of the execution of the aforesaid real estate mortgage and assignment of claim, IT IS AGREED as follows: 1. The Second Parties agree to release and do hereby release and discharge the First Parties from any and all claims and obligations to the Second Parties except as may be otherwise expressly provided herein; provided, however, that this release and discharge shall not in any manner affect, diminish or reduce the right of the Second Parties to receive: (1) Their pro rata distribution of the funds arising from the liquidation of the assets of Modern Refrigeration Co., Inc.; (2) The amounts which will become distributable to the Second Parties under the aforesaid assignment of creditor's claims of the First Parties against Modern Refrigeration Co., Inc.; (3) The full proceeds of the sale which may result in the event of foreclosure of the aforesaid mortgage on real estate, it being the understanding of the parties that *218 as to the amounts represented by items (1), (2) and (3) of this paragraph, the obligation of the First Parties under said Guaranty agreement shall remain in full force and effect until the distribution and payment of the funds represented by the said items (1), (2) and (3). 2. Notwithstanding any other provision herein, it is understood and agreed that this release does not in any manner or form release, discharge or in any other way affect the actual or contingent indebtedness and liability of Modern Refrigeration Co. Inc., to the Second Parties, but the same shall remain in full force and effect notwithstanding any of the provisions of this agreement. 3. It is further understood and agreed that the release provided for herein does not apply to the obligation of the First Parties under the covenants of the aforesaid real estate mortgage, but such obligations shall remain in full force and effect notwithstanding this release. 4. Notwithstanding any other provision herein contained it is agreed that in the event that the amounts which will be distributed as set forth in items (1), (2) and (3) of paragraph 1 hereof to the Second Parties shall be insufficient to provide for payment *219 in full of the aforesaid amounts owing by Modern Refrigeration Co., Inc., to Second Parties on the aforesaid open account of $151,380.36 and upon the aforesaid promissory note in the principal sum of $10,000.00, the First Parties shall remain individually liable to the Second Parties to the extent of but not to exceed $5,000.00, and provided, further, that if any amounts become payable by the First Parties to Second Parties under the terms of this paragraph, the same shall be payable as follows: Each of the First Parties shall have the right to pay their respective obligations under the terms of this paragraph in the sum of $2,500.00 each in equal installments of $1,000.00 per year, without interest, to the end that the full $5,000.00 or lesser sum, as the case may be, shall be paid within the period of two and one-half years from the date that the amount of the obligation under this paragraph shall be determined. 5. It is understood and agreed that Second Parties have entered into this release and agreement upon the promise and representation of the First Parties that neither of the First Parties presently owns or controls, directly or indirectly, any assets or property of any kind *220 or description, real or personal, tangible or intangible, other than the real property and claims against Modern Refrigeration Co., Inc., hereinabove referred to, and other than their homes, furniture and household effects, personal effects, personal automobiles, personal bank accounts and cash not to exceed the total sum of $15,000.00, all rights and interest in personal life insurance policies, including savings accounts in the names of the First Parties which have been established to provide for reserves for premiums on such policies, corporate securities, the fair market value of which shall not exceed the sum of $4,000.00, interest of Parutto in the Earlington Gardens property, and all rights and interest which the First Parties may have in the capital stock of Ted's & Gene's Foodliner, Inc., a corporation; provided further, however, that in the event that the promise and representation provided for in this paragraph shall be incorrect, the remedy of the Second Parties in such case shall be to enforce the personal liability of the First Parties under the aforesaid guaranty to the extent of the value of any such undisclosed property in the event that the proceeds to be received *221 as otherwise provided herein by the Second Parties shall be insufficient to fully satisfy the claims of the Second Parties against Modern Refrigeration Co., Inc. IN WITNESS WHEREOF, the parties have executed this instrument this 9th day of August, 1963. /s/ Joseph L. Parutto /s/ Richard D. Lord /s/ Mildred Lord First Parties HUSSMANN REFRIGERATION, INC.
By /s/ V. B. Winkeler Asst. Secy.-Treas. 656 HUSSMANN REFRIGERATOR CO. By /s/ V. B. Winkeler Asst. Secy.-Treas. HUSSMANN ACCEPTANCE CO. By /s/ V. B. Winkeler Secy.-Treas. Second Parties Thus, under the terms of the August 9, 1963, agreement and release, the obligations of Richard and Mildred under the guaranty agreement of December 20, 1961, were to remain in full force and effect until the distribution and payment of the funds from the liquidation of assets, the assignments of the "first parties" and the proceeds of "the sale which may result in the event of foreclosure of the aforesaid mortgage." On January 2, 1965, Richard, Mildred, Joseph and Ruth entered into an agreement and release with the Hussmann Companies. Said agreement provided in part: Whereas the mortgagees under such mortgage have commenced *222 an action to foreclose such mortgage in King county superior court, Cause No. 630686, and the parties hereto desire to settle their differences amicably. Now, therefore, Obligors and Hussmann, jointly and severally agree as follows: 1. Obligors shall forthwith convey by quit claim deed all of their interest in and to the above described mortgaged premises in lieu of foreclosure of such mortgage and do hereby release, discharge and satisfy any and all claims they or any of them may have against Hussmann or any of them on account of any agreements and transactions Obligors, or any of them, may have had with Hussmann, or any of them, to the date of this agreement regardless of the nature thereof. 2. Obligors shall have the right to remain in possession of the above described premises until April 1, 1965, without obligation for rent and shall vacate such premises and remove all of their property therefrom on or before such date. In this respect time is of the essence. Obligors shall cause all heat, water, sewer, electricity and other utilities to be paid for the period during which they are in possession, shall cause no liens or encumbrances to attach to such property during such *223 period of possession, shall not permit or cause any waste to the property or improvements thereon during such period of possession, shall indemnify and save Hussmann harmless from any liability to other persons or to the property of others arising on account of such possession and shall maintain liability insurance during the term of such possession for $100,000/300,000. 3. Obligors shall pay Hussmann the sum of $2,500 in installments of $1,000 on or before December 31, 1965, $1,000 on or before December 31, 1966, and $500 on or before June 30, 1967. Obligors shall have the right of prepayment. 4. Except for the obligations of Obligors as above stated, Hussmann, and each of them, do hereby release, satisfy and discharge Obligors, and each of them, from and on account of any claims and liabilities arising from any agreements and transactions that Obligors, or any of them, may have had with Hussmann, or any of them, to the date of this agreement regardless of the nature thereof. Hussmann shall cause Obligors, and each of them, to be dismissed with prejudice and without costs from King county superior court cause No. 630686, provided that in the event that Hussmann's attorneys shall *224 deem it advisable in their sole discretion to proceed to foreclose the mortgage sought to be foreclosed in such action, then Obligors shall cooperate in securing such judgment as soon as possible but no judgment for any personal liability shall be entered against them by Hussmann in such proceedings. DATED at Seattle, Washington, this 2nd day of January, 1965. On January 22, 1965, Richard, Mildred, Joseph and Ruth delivered a quit claim deed for 200 Second Avenue to Refrigeration, Inc. Said deed read in part: This deed is given in lieu of foreclosure of that certain Mortgage of date August 9, 1963, made by Grantors as Mortgagors, to Hussmann Refrigeration, Inc., a corporation, Hussmann Refrigerator Co., a corporation, and Hussmann Acceptance Co., a corporation, as mortgagees * * *. Grantors expressly waive, relinquish and release any right of redemption. The fair market value of the real property and improvements thereon, located at 200 Second Avenue, on both August 9, 1963 (the date of the mortgage), and January 22, 1965 (the date of the deed), was $139,000. The adjusted basis of the interest of Richard and Mildred in the property located at 200 Second Avenue on August 9, 1963, and *225 January 22, 1965, was $19,451. It is stipulated that Richard and Mildred sustained a loss of $59,587 (one-half of the fair market value of $139,000, reduced by petitioners' share of the first mortgage not 657 yet amortized) from the payment of their guarantee of the obligations of Modern to the Hussmann Companies, and that they realized a capital gain of $50,049 on the exchange of their interest in the property at 200 Second Avenue. In their 1963 individual income tax return Richard and Mildred reported, inter alia, a loss in the amount claimed to have been realized by them on delivery of the second mortgage on the 200 Second Avenue property. They also filed an "Application For Tentative Carryback Adjustment" to 1960, 1961 and 1962. The above 1963 loss (and therefore the carrybacks) was disallowed by the statutory notice of deficiency. Opinion Petitioners, who are cash basis taxpayers and who, under an agreement of guaranty, were liable for certain debts of their Subchapter S corporation, claimed a loss on their joint 1963 income tax return. In connection therewith petitioners applied for and were allowed a tentative carryback adjustment to the other years here in issue. *226 In his notice of deficiency respondent permitted a loss deduction in 1963, only to the extent of petitioners' basis in the stock of their Subchapter S corporation plus the amount of the loss suffered from their assignment of an account receivable to a creditor of their said corporation. Petitioners had personally guaranteed certain debts of their said Subchapter S corporation. In 1963 they gave a mortgage on their interest in a building to a creditor whose debt they had guaranteed, and they subsequently deeded such interest to the creditor in 1965. Because of concessions, the only remaining issue is whether 1963 (the year of the mortgage) or 1965 (the year of the quit claim deed in lieu of foreclosure) is the year in which petitioners' loss occurred. Respondent's determination that the loss year is 1965 also (because of the carrybacks) results in the determined deficiencies in 1961 and 1962. Petitioners argue that: (1) their loss was fixed in 1963 because the losses of the Hussmann Companies (the creditor whose debt they had guaranteed) were fixed in 1963; (2) that their loss was deductible under section 1.461-1(a)(1), Income Tax Regs.; and (3) that petitioners granted a property *227 interest on August 9, 1963, which was tantamount to payment of an ordinary business loss. We shall treat each contention separately. 1. We must reject petitioners' first contention on two grounds. First, we have not found (and cannot) that the losses of the Hussmann Companies were fixed and definite in 1963. In fact the record indicates that a claim filed by Hussmann Acceptance Company in the amount of $730,592.15 was not reduced (to $150,000) until June 23, 1964. Moreover, final accounting and distribution to Modern's creditors was not made until 1965 because of pending litigation against Modern and Refrigeration, Inc. In addition, even if Hussmann's losses were fixed in 1963, that fact alone would not fix the time, nor necessarily the amount of the loss of their guarantor. 2. Petitioners argue that on August 9, 1963, they surrendered a valuable property interest by delivering the second mortgage on 200 Second Avenue; that as of December 31, 1963, their loss thereon could be computed at $59,587, and that under section 1.461-1(a)(1), Income Tax Regs., they can deduct said loss. Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable *228 year and not compensated by insurance or otherwise. Subsection (c) of section 165 provides limitations on losses of individuals. The parties herein are in agreement that petitioners' loss falls under section 165(c)(2): SEC. 165(c)(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * * Section 1.165-1, Income Tax Regs., provides: (b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events * * * actually sustained during the taxable year. * * * * * * (d) Year of deduction. (a) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * * The above portions of section 1.165-1 demonstrate that for a loss to be deductible, it must be actually sustained during the 658 taxable year, evidenced by a closed and completed transaction *229 and fixed by an identifiable event. Petitioners' execution and delivery of the mortgage in 1963 neither amounted to payment nor resulted in the completion of a transaction. The mortgage clearly states that it is given to secure the obligation of petitioners under the guaranty agreement of December 20, 1961. Securing an obligation to pay does not equate with payment. Moreover, the mortgage, by its own terms, was not payable until the final liquidation of Modern, or on October 1, 1964, whichever occurred first: The obligation of this mortgage shall mature and become payable at the time of and upon the day that the assets of Modern Refrigeration Co., Inc., are finally liquidated in a pending insolvency liquidation. In any event, this mortgage shall become payable not later than October 1, 1964. Finally, the mortgage set forth the rights and remedies of the mortgagees in the event of default. We think it is clear under the above facts that the mortgage was not intended to be, and was not payment but, merely security for the Hussmann Companies on the obligations of Modern which petitioners had guaranteed. Eckert v. Burnet, 283 U.S. 140 (1931). We note further that *230 in the State of Washington a mortgage is only a lien upon property to secure payment of a debt and thus title does not pass to the mortgagee. Parks v. Yakima Valley Production Cr. Ass'n, 194 Wash. 380, 78 P. 2d 162 (1938); Fleishbein v. Thorne, 193 Wash. 65, 74 P. 2d 880 (1937); Cochran v. Cochran, 114 Wash. 499, 195 Pac. 224 (1921). Petitioners, by their construction of section 1.461-1(a)(1), Income Tax Regs., seek to circumvent recognized accounting rules applicable to cash basis taxpayers. Section 1.461-1(a)(1) provides in part: Sec. 1.461-1 General rule for taxable year of deduction. (a) General rule - (1) Taxpayer using cash receipts and disbursements method. Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid. Further, a taxpayer using this method may also be entitled to certain deductions in the computation of taxable income which do not involve cash disbursements during the taxable year, such as the deductions for depreciation, depletion, and losses under sections 167, 611, and 165, respectively. *231 * * * Petitioners rely on the third sentence of the above-quoted regulation. The third sentence modifies the second by stating that a taxpayer using this method (cash) may be entitled to certain deductions in a year in which no cash disbursement has been made and uses as an example sections 167, 611 and 165 of the Internal Revenue Code. The use of the words "may" and "certain" demonstrate that some, but not necessarily all, such deductions are allowable. We interpret the above regulations to permit a deduction for such recognized noncash expenditures as depreciation (section 167), depletion (section 611), and losses where an original expenditure has been made and thereafter the acquired asset has been proven worthless, been stolen, destroyed or otherwise lost (section 165); accordingly, we hold that the third sentence of the aforesaid regulations is not applicable to the facts of the instant case. In our view this case is indistinguishable from, and controlled by Helvering v. Price, 309 U.S. 409 (1940), reversing 106 F. 2d 336 and affirming a Memorandum Opinion of this Court. In that case the taxpayer had satisfied his guaranty by delivering his secured *232 promissory note to the bank which held it and sought to deduct his loss in that year. Mr. Chief Justice Hughes, speaking for the Court, said at 413-414: * * * 'merely exchanged his note under which he was primarily liable for the corporation's notes under which he was secondarily liable, * * * * * * * * * urges that his note was secured, but the collateral was not payment. It was given to secure * * * promise to pay, and if that promise to pay was not sufficient to warrant the deduction until the promise was made good by actual payment, the giving of security for performance did not transform the promise into the payment required to constitute a deductible loss in the taxable year. See Jenkins v. Bitgood, 101 F. 2d 17, 19. 3. We believe that petitioners' third argument has also been fully answered by the 659foregoing. Accordingly, we find and hold that the mortgage, which was given to secure petitioners' obligations, was not intended as payment but merely as security, and that the identifiable event which completed and closed the transaction evidencing the loss sustained by petitioners was the satisfaction of the mortgage in 1965 by the delivery of the quit claim *233 deed. Decision will be entered for the respondent. Footnotes
1. Unless otherwise stated all references herein are to the Internal Revenue Code of 1954.↩